Mr. Justice CLIFFORD
 

 delivered the opinion of the court.
 

 This is an appeal in admiralty, from a decree of the Circuit Court of the United States for the southern district of New York, in a cause of collision, civil and maritime. It was commenced in the District Court on the twenty-fourth day of September, 1851, by the appellee, in behalf of himself and the other owners of the brig “Alfaretta.” According to the case made in the libel, the Alfaretta sailed from Millbridge, in the State of Maine, on the tenth day of August, 1851, fully laden 'with lumber on freight, and bound on a voyage to the port of New York. She was ¡a tight, stanch, strong vessel of one hundred and sixty-three tons burden, and in every respect well manned, tackled, apparelled, and appointed, with a competent master, and sufficient crew; and was totally wrecked by the collision which occurred on the sixteenth day of the same month, without any fault of her officers or crew, and while she was lawfully pursuing her voyage from the place of departure to her place of destination. At the time of the disaster she was fifteen or twenty miles off the southern shore of Long Isl- and, sailing close hauled on the wind, with her larboard tacks aboard, and all her sails set, and was heading about northwest by west. While sailing on that course, with a light wind from southwest by west, her master and crew discerned a light bearing from them about west half south, which they judged tobe the light of a steamer; and the libellant, who was the master of the Alfaretta, immediately caused a light to oe.hoisted in
 
 *375
 
 the fore rigging of the brig. That vessel proved to be the steamship Pacific, and it is alleged that she had such a large number of lights that the libellant was not able to determine what direction she was steering, and kept his vessel on her eourse, without any deviation, until the collision took place: It occurred between eight and ten o’clock in the evening, as alleged in the libel, and about fifteen minutes after the light was placed in the fore rigging of the. brig, when the steamer, with great force and violence, ran into and struck the brig on her larboard bow, cutting her down to the water’s edge, and carrying away her foremast, so that she filled in a few minutra and became a complete wreck.
 

 On the fourteenth day of October, following, the claimants of the steamer filed their answer to the allegations of the libel. Among other things, not necessary to be noticed, they deny that the steamer had such a large number of lights at the time referred to, that the libellant was not able to determine what direction she was steering; and they also deny that the brig kept her course, without any deviation, until the collision oe- ' curred; or that the steamer ran into and struck the brig in the manner above-stated. Their theory is, and they accordingly allege that the steamer started from New York on the day of the collision, on her intended voyage to Liverpool, well manned and equipped for the voyage, and in every respect seaworthy; and that the look-out of the steamer, who was stationed at the forecastle, while she was proceeding on the voyage, between seven and eight o’clock in the evening, the weather being cloudy and the night dark, the wind southwest by south, and the steamer steering east half south, with her ,usual lights displayed, discovered the light of a'vessel about two and a half points on the starboard bow of the steamer. Whereupon the helm of the steamer was immediately put to the starboard, and she at once swung off to east-northeast, and at or -about the same time her engines were stopped.- That vessel so discovered was the brig Alfaretta. She was close hauled on the wind at the time, and was steering to the westward, as the respondents allege, in a course nearly parallel to that of the steamer; but, instead of keeping her course,' as she should have done,
 
 *376
 
 she suddenly and unexpectedly put her helm to port, and kept off, and came with her bows on to the steamer, striking her a little forward of her starboard wheel, which passed- over the bows of the brig, cutting her down -and damaging the steamer to the amount of two thousand dollars. And they explicitly allege, that if the brig had kept her course, and had not put per helm to port, the collision would have been avoided. This statement, derived from the pleadings, exhibits very fully the real nature of the controversy between the parties, and the grounds assumed on the one side and the other in the prosecution and defence of the suit. Testimony was taken on both sides, in the District Court, and, after hearing, a decree was entered that the libel, be dismissed, each party paying their own costs, and the libellant appealed to the Circuit Court. Both parties appeared by counsel in the Circuit Court, and, after a full hearing, it was ordered and adjudged that the decree of’ the District Court dismissing the libel be in all things reversed, and that the libellant do recover the damages sustained by reason of the collision, together with costs in both courts, and that the cause be referred to a commissioner to ascertain and report the.damages. Additional testimony was taken before the commissioner, who reported that the sum of seven thousand one hundred and seven dollars and nineteen cents was due to the libellants, to which report the respondents excepted j and, after the hearing upon, the exceptions,-the report was confirmed by the court, and a decree entered that the libellant recover the sum reported with costs. Whereupon a final decree was entered, in pursuance of the report, and the respondents appealed to this court. Many of the facts and circumstances attending the disaster, as well as those which preceded it, are so fully proved that they cannot properly be regarded as the subject of dispute. As alleged in the libel, the collision took place in the open sea, on the sixteenth day of August, 1851, some fifteen or twenty miles off the southern shore of Long Island. It occurred a little past eight o’clock in the evening, after the officers in charge of the respective vessels had been fully apprised of the approaching danger, and under circumstances which make it manifest that it ought to have
 
 *377
 
 been prevented. Both vessels had proper lights at the time, and competent and sufficient look-outs; and it is clearly'proved that the duties of the look-outs were vigilantly and promptly performed. Lights had not been set on the brig when her lookout first discerned the light of the steamer from the forward part of the vessel. One had been prepared, however, and lighted by the steward, and was An the galley forward of the house on the deck, ready for that purpose. On seeing the light of the steamer, the look-out of the brig at once reported the fact to the master, who was then walking the deck, and he immediately caused the light, which was burning brightly, to be hoisted in the fore rigging of thé brjg, and it was kept there,' in full view of the "approaching steamer, until the vessels came together. Coffin, who hoisted the light, and was the look-out on the brig; testifies that he tied the light just under the fore-. yard, and remained standing in the rigging, watching the light of the steamer as she approached, until she was so near that be.had just time to descend to the deck and take a few steps aft when the vessels struck. He says it was about fifteen minutes after he reported the light of the steamer to the master of-the brig that the collision occurred; and, in this particular, he is strongly confirmed by the mate of the steamer, who admits that the brig was about three miles distant when her light was ■reported to him, as the officer of 'the. deck, by the look-out on the starboard bow of the steamer. At the time the light of the steamer was first seen by the look-out, the brig was sailing on a course of northwest by west, close hauled on the wind, with her larboard tacks aboard, and all her sails set. She was converging towards the track of the steamer, and was going through the water only three .or four miles an hour, the wind being light, and blowing from the southwest by wést.
 

 Several witnesses describe the character of the night as overcast, and some speak of it as cloudy, with intervening stars; but all agree that it was not unusually dark. They all concur in saying that the surface of the sea was smooth, and there was no haze or mist on the water; and the mate of the steamer testifies that objects could be seen without lights at the distance of three miles. .
 

 
 *378
 
 When the steamer discovered the brig, she had all her signal lights displayed, and was on a course of east half south, and was moving through the water at the rate of twelve or thirteen miles an hour, using all her sails as well as her engines. Her' mate and look-out first saw the light of the brig, and they testify that the bearing of the light was some two and a half points off the starboard bow of the steamer. Their statements, however, do not entirely agree with the testimony of the master. He was in his room at the time, calculating the position of the steamer, and did not hear the light of the brig reported. While there, he heard the mate call out, “hard a-starboard,” and instantly went up on to the paddle-box of the steamer.
 

 His.account of the bearing of the brig is not entirely clear, as given in the record, or very satisfactory. At first, he says he saw the brig two and a half to three points off the starboard, bow of the steamer, but finally fixes it at two points; and adds, to the effect that she was not over one-third of a mile distant. He admits, however, that the steamer was then swinging off rapidly towards Long Island shore; and. of course, if the bearing was only two points when the master reached the paddle-box, it must have been much less than two and a half 'points at the time the light was first discovered,, as the vessels were then three miles apart, and the. order of the mate, to starboard the helm, had not then been given; and of course the steamer ' did not.commence to swing off to port till after that order was given and executed.
 

 According to the testimony of the mate, his first order, after seeing the light of the brig, was to starboard the helm, and then, he says, the vessel began *to swing off; and it was not until after he left the position he then occupied, and went on to the paddle-box, that he gave the order, hard a-starboard. After that order was given, and the usual response received from the wheelsman, then, he says, the master came by his side, and repeated the order, adding that “ the vessel will be into us — stop her; ” and the mate says- that the steamer had then swung off about three points; and yet the master says that the bearing:of the light of the brig was still two points off the starboard bow of the steamer.
 

 
 *379
 
 Statements so conflicting and uncertain do not furnish any definite elements which can safely be made the basis of a reli- • able mathematical calculation as to the precise bearing of the brig when her light was first seen, and are not entitled to much consideration in determining the question how the collision was produced.
 

 Some uncertainty also exists as to the precise bearing of the steamer when her light was first discovered from the brig. It is stated in the libel as about west half south, and the testimony of the witnesses is equally indefinite. One witness estimates it at about three points off the larboard bow of the brig; another says it was aboút two points in the same direction; and a third witness says it was about west. Such indefinite statements cannot afford much aid in determining the principal question involved in this controversy.
 

 Whatever may have been the precise position of the vessels with respect to each other at the time the light of the steamer was first discovered by .the look-out of the brig, it is certain that the course of the brig was converging towards the track of the steamer, and that they came together in the course of fifteen minutes after the light was reported to the master; and tire brig was run down and lost. It was the starboard bow of the steamer which came in- contact with- the larboard bow of the brig, forward of the’ fore-swifter, and slewed her round, carrying away her bowsprit, foremast, and main-topmast, and cutting her down to the water’s edge; and -such was the headway of the steamer at the time, that she swept on for a considerable distance, without any apparent abatement of her speed, notwithstanding her engines were stopped and reversed just before the collision took place.
 

 All the circumstances tend to show that the disaster might have been prevented, and that there was'fault- somewhere, for which the offending party ought to be held responsible. Both parties appear to have so understood the matter when they made up their pleadings, as well as in the subsequent conduct of the cause.
 

 It is alleged in the libel that the .brig kept her course after the light of the steamer was seen, without any deviation, until
 
 *380
 
 the collision occurred. On the part of the respondents, that allegation in the libel is denied; and they allege that the brig, when her light was first seen, was steering to the westward, close hauled on the wind, and in a course nearly parallel to the steamer; but instead of keeping her course, as she should have done, that she suddenly and unexpectedly put her helm up, kept off, and .came with her bows on to the steamer.
 

 Such is, the issue, as made up by the parties in the pleadings, ' and it presents the principal question of fact to be determined by the court.
 

 Our views upon the point cannot be stated in a manner which would be satisfactory to those interested, without some brief reference to the evidence on which they are based.
 

 When the disaster occurred to the brig, her whole company, ’ consisting of seven men, including the master and mate, were on the deck of the vessel, and witnessed the events. Four were examined as witnesses; and the mate testifies that it was the watch of the master, who, being the libellant and one of the owners of the vessel, was not examined. His watch commenced at eight o’clock in the evening, when the preceding watch closed. From six to eight o’clock, the mate had charge of the deck, and he says that the course of the brig at sunset was northwest by west; that she was sailing close hauled on the windj and continued on the same course until eight o’clock, when he went below. He remained below until he heard a light reported, when he immediately went on deck, and at first saw only one light, but, as the vessel approached nearer, he saw more, and supposed it was a steamer; and he testifies positively that the brig did not change her course, after he went on deck, until the steamer struck her. On his return to the deck, he did not look at the compass, but says the brig was on the wind, with her larboard tacks aboard, and, in his judgment, was going the same course as when he went below.
 

 Three of the seamen were also examined, and their testimony is equally full and explicit, and to the same effect. ' One of them was the.look-out, who first discovered the; light of the steamer, and reported it to the master;, and the other two, on hearing his report, immediately went on deck, and remained
 
 *381
 
 throughout, watching the light as it approached,, and with every opportunity to see and observe whatever transpired on the deck of the vessel. Some one or more of them testifies that the master twice gave the order “ to keep her full and by,” as the steamer advanced, and they all concur that the brig did not change her course, and that .no danger was apprehended until just before the collision took place. All must admit that they had ample means of knowledge upon the subject of their testimony; and if their statements are incorrect, they must have'wilfully perverted the truth, which is not to be presumed. Several witnesses, however, examined on the part of the respondents, testify that the brig did change her course before the vessels came together; and among the number is the mate of the steamer, who beyond doubt describes the events truly, as they appeared to him at the time of the occurrence.
 

 His testimony, as it is exhibited in the record, furnishes conclusive evidence that the two vessels were very close together, if not in actual contact, when the supposed change of course was made, and presents some ground of inference that the jib-boom of the steamer, or the rigging connected with the bowsprit, as they swept over the stem of the brig, or pressed against her fore rigging, may have produced the state of things which induced him to think that the brig had ported her helm. At first he said the change was made just before the collision, then immediately before it; but, upon further interrogation, he said it was before the jib-boom of the brig had touched the steamer, and finally added that the brig might have been twice the length of the ship off. All of his statements, however, are based upon the theory that the brig ran into the Steamer, when it is satisfactorily shown that the real state of the case was the reverse. It was the bow of the steamer, near the cat-heads, which struck the jib-boom of the brig, and carried it away; and the evidence furnishes strong reasons to conclude that the brig had been partly slewed round just before that occurred. Be that as it may, it is certain from the evidence that the brig kept her course until just before the collision took place. When the mate of the steamer first saw her light, he says it was about three miles distant, and he admits that her direction then was
 
 *382
 

 '
 
 north of west, and that he did not notice, any change of her course, except the one already mentioned, when the vessels were close together. When the master went up on to the paddle-box of -the steamer, and repeated the order previously given by the mate to put the helm hard a-starboard, he says the brig was then sailing close hauled on the wind, and that the two vessels were not more than a third of a mile apart. His account of the change of course is, that it was made after that order was given, and he says the brig instantly turned directly across the bows of the steamer, and came right into'her, thus showing- conclusively that the’ alleged change, however produced, was made at the moment of collision. These references to the testimony of the witnesses must suffice, and they are believed to be amply sufficient to show what the state of the evidence is, as it’ is exhibited in the record. One remark is applicable to all of the witnesses introduced by the respondents; and that is, they had not'the same means of knowledge respecting the matter in dispute as the witnesses for the libellant possessed, who had charge of the brig, and governed her course; and in weighing the evidence, and determining its foi’ce and effect, that important consideration cannot be overlooked. It must be admitted that the witnesses on the part of the libellant speak from actual knowledge, and, unless they have wilfully stated what they know to be false, their statements must be correct. They were on the deck of the vessel, interested, so far as their personal safety was concerned, to observe everything that transpired as the steamer appi'oached, and they cannot well be mistaken in respect to the matter tinder consideration.
 

 Those on board the steamer appear in the record under very different circumstances. They only infer what they, have affirmed as to what transpired on the deck of the brig, and., at best their statements respecting the matters in question are of the nature of opinions, and it is not difficult to see that they may be in error. In the excitement and confusion of the moment, they may have mistaken what was occasioned by the momentum of the steamer or the pressure of her bowsprit or jib-boom upon the stem or fore riggingmf the brig, for a change of course pro
 
 *383
 
 dueed by an alteration of her helm. All the testimony tends to show that the two. vessels came together at an obtuse'angle, and there is much reason to think that the brig had been pressed out of her course before the bows of the vessels came together. At all events, such an inference from the evidence' is far more reasonable than would be the conclusion that all the witnesses for the libellants have wilfully perverted the truth. Other grounds of reconciling the testimony consistent with the integrity of all the witnesses might be suggested, but we think it unnecessary, as the evidence clearly shows that the "brig kept heij course, without any change whatever, until the peril was impending and the collision inevitable.
 

 An error committed by those in charge of a vessel under such circumstances, if the. vessel was otherwise without fault, would not impair her right to recover for the injuries occasioned by the collision, for the plain reason that those who produced the peril and put the vessel in that situation would be chargeable with the error, and must answer for the consequences.
 

 Our conclusion, however, on this branch of the case, is, that the respondents have failed to support the allegation of the . answer, that the brig changed her course after the light of the. steamer was discovered, and that the evidence satisfactorily shows that she did not change her course in any sense which can be' regarded as a fault. Sailing vessels when approaching a steamer are required to keep their course; and steamers, under such circumstances, as a general rule, are required to keep out • of the way. Many considerations concur to show that all those' engaged in navigating vessels upon the seas are.-bound to observe the nautical rules recognised and approved by the courts, m the management of their vessels on approaching á point where there is danger of' collision. Those rules were framed and are administered to prevent such disasters and to afford security to life arid property exposed to such dangers; and public policy, a'g well as the best interest of all concerned, requires that they should be constantly and rigidly enforced in all cases to which" they apply. New cases can be imagined where it is more needful that they should be observed than when a steamer . and a sailing vessel are approaching each other from opposite
 
 *384
 
 directions, or on intersecting lines, for the obvious reason that the negligence of the one is liable to baffle the vigilance of the other; and if one of the vessels under such eircumstánces follows the rule, and the othér omits to do so, or violates it, a collision is almost'certain to follow:
 

 Rules of navigation, such as have been mentioned, are obligatory upon vessels approaching each other, from the time the necessity for precaution begins, and continue to be applicable as the vessels advance, so long-as.the means and opportunity to avoid the danger remain. They do not apply to a vessel required to keep her course after the approach is so near that the collision is inevitable, and áre equally inapplicable to vessels of every description, while they are yet so distant from each other that measures of precaution have not become necessary to avoid a collision. Sailing vessels approaching a steamer are required to keep their course on account of the correlative duty which is devolved upon the steamer to keep out of the way; in order that the steamer may know the position of the' object to be avoided, and may not be led into error in her endeavor to comply with the requirement.
 

 Under the rule that a steamer must keep out of the way, she must of necessity determine for, herself and upon her own responsibility, independently of the sailing vessel,- whether it is safer to go to the'right or left, or to stop; and in order that she may not be deprived of the means of determining the matter wisely, and that she may not'be defeated or baffled in the attempt to perform her duty in the emergency, it is required in' the admiralty jurisprudence of the United States that the sailing vessel shall keep her course, and allow the steamer to pass either on the right or left, or to adopt- such measures of precaution as she may deem best suited to enable her to perform her duty and fulfil the requirement of the law to keep out of .the way.
 

 Repeated decisions of this court have affirmed the doctrine here laid down, and carried it out to its logical conclusion, and in so many instances that the question cannot any longer be regarded as open to dispute. Accordingly, it was held in the case of the steamer. Oregon
 
 v.
 
 Rocca et al., (18 How., 570,) that
 
 *385
 
 when a steamer approaches a sailing vessel, the steamer is required to exercise the necessary precautions to avoid a collision; and if this'be not done,
 
 prima, fade
 
 the steamer is chargeable with fault. That decision was founded upon the rule previously established in St. John
 
 v.
 
 Paine et al., (10 How., 583,) where the whole subject is elaborately considered, and the reasons of the rule fully explained. Similar views are also maintained in the case of the Genesee Chief, (12 How., 461,) and in various other cases to the present time. Exceptional cases may be imagined in a crowded thoroughfare, where the rule would not be applicable, but those will be considered when they arise. Such precautions as are inculcated in the rule referred to are enjoined, as before remarked, to prevent collision and afford security to life and property; and in a ease where the rule could not be followed without defeating the end for which it was established, or without producing the mischief which it was the design of the rule to avert, of course it would not be applicable,.and in such a cáse a departure from it would be both justifiable and commendable.. Extreme cases, such as are supposed, will rarely if ever occur, and in referring to them it must not be understood that the rule will be relaxed to any extent whatever in other cases to. which it properly applies.
 

 Applying these principles to the case under consideration, it is obvious what the result must be. It is not denied that the collision took place, and that the brig was run down and lost; and such being the fact, and the evidence exhibited failing tó satisfy the court that the brig was in fault, or the disaster inevitable, it necessarily follows that the collision was the result of fault on the part of the steamer, and that the steamer , is answerable to the libellant for the damagé.
 

 - Our attention was also drawn, at the argument, to the amount of thé damagé as reported by the commissioner, and it was insisted that it is excessive. . On that point it will be sufficient to say, that after a careful examination of the testimony before him, we see no. ground to doubt that his duty was rightly performed. '
 

 The decree pf the Circuit Gourt, therefore, is affirmed, with costs. ’ ■ '