### THE JOHN F. GAYNOR.

(District Court, E. D. Pennsylvania. April 7, 1902.)

No. 64.

COLLISION—STEAMER AT REST—PASSING TUG WITH TOW.

An incoming British steamship in charge of a licensed pilot stopped off the quarantine station in the Delaware river in the usual place, which was near the western side of the channel, to undergo the customary medical inspection. She did not anchor, and it was not customary to do so. While so lying, with the quarantine flag up, and while the examination was being made, a tug came down the river with two heavily laden scows without rudders in tow on a line some 1,400 to 1,600 feet long. Each vessel saw the other when a mile distant, and the tug understood the position of the steamship and the purpose for which she had stopped. The tug was properly on the westerly side of the channel, but there was ample room for her to pass to the eastward of the steamship, so as to avoid any danger of collision. She passed so close, however, that both of the scows sheered, and struck the steamship, which had not moved, and injured her. Held, that the tug was solely in fault for the collision in failing to keep at a safe distance in passing.

In Admiralty. Suit for collision.

Henry R. Edmunds and Convers & Kirlin, for libelant.

James J. Macklin, for respondent.

J. B. McPHERSON, District Judge. This is an action brought to recover damages for a collision that took place about 3 o'clock in the afternoon of June 16, 1899, between the tug John F. Gaynor and the British steamship Vedra, in which the steamship was injured. The Vedra was on her way from London to Philadelphia in ballast, drawing about 10 feet of water, and was proceeding up the Delaware river in charge of a duly licensed pilot. She is a tank vessel, built of steel, 2,622 tons net register, 435 feet long, 45 feet beam, and was properly manned and equipped. As she approached the Reedy Island quarantine station,—which is upon a pier running parallel with, and

close to the western edge of, the channel,—the quarantine flag was hoisted upon her foremast, her engines were stopped, and by the time she came nearly abreast of the station her way had practically ceased, so that she was merely being borne slowly up the river by the tide, which was then nearly flood. She did not anchor, but the testimony shows clearly that it is not customary for vessels to anchor while the medical examination is going on. A government boat put out from the station, carrying a physician, and the examination was begun. While it was going on, the tug came down the river, towing two square-bowed scows tandem, each being heavily loaded with stone, and drawing 12 or 13 feet of water. The total length of the tow was from 1,400 to 1,600 feet, each scow being 30 or 40 feet wide and about 150 or 160 feet long, and having no rudder or independent means of propulsion. The day was clear, and the wind was blowing briskly from about northwest. Each vessel saw the other more than a mile away, and understood the other's character and situation. The tug did not expect the steamship to anchor, but knew that she was lying at rest upon the water, undergoing, or about to undergo, examination by the quarantine physician. The boiler of the tug was not in very good condition, so that she was not able to exert her full power, but she was proceeding down the river against the tide at a speed of 3 or 4 knots an hour. At the time she saw the steamship, the tug was on the westward side of the channel, and, under ordinary circumstances, it was proper that she should be where she was. But when she saw the steamship at rest upon the water, with the quarantine flag flying, and knew that she was obliged to interrupt her voyage until the examination should be completed, it became the duty of the tug, as the moving vessel, to take every reasonable precaution to keep out of the way. There was ample room and depth of water for the tug to pass so far from the steamship that no collision could have possibly taken place. The channel was wide at this point, and there were no vessels near enough to offer any obstruction. The tug, however, kept her course so closely that when she approached the steamship it was evident that she would be obliged to pass within a few feet. She herself managed to get by in safety, but the first scow sheered toward the steamship, and broke one of the blades of the screw, and the second scow sheered more decidedly, and with her forward starboard corner struck the ship a severe blow on the starboard bow, doing a good deal of damage.

It is argued on behalf of the tug that the steamship was at fault, because she did not anchor, because she was too far out in the channel, and because it is averred that she made certain movements with her engines that put the ship into a more dangerous position than she would have otherwise occupied. It is also argued that she did not keep a proper lookout, and therefore did not see the tug in time to move out of the way. In my opinion, none of these charges is well founded. The pilot and second officer were on the bridge, other officers and men were on the deck, and the tug was seen more than a mile away. The steamship stopped in the customary place, and was not, I think, more than 500 or 600 feet from the station. She was not obliged to anchor, in the absence of special circumstances indicating

that to be her duty. I am also of opinion that her engines were not put into motion at all while she was undergoing examination. An order to go ahead was undoubtedly given, but it was countermanded immediately, and was not carried into effect. No signals were given by either vessel, and none was required. I see no reason, therefore, to charge the steamship with any fault. As it seems to me, the collision is properly chargeable to the tug for approaching too close to the ship with so unwieldy a tow. It is well known that scows of this description are very apt to sheer, as they have no rudder or other means of guidance than the tug itself; and, as these were being towed on a very long hawser, the danger of sheering was increased. The tug was bound to take note of the position of the ship and the business upon which she was engaged, and to pass far enough to the eastward to avoid the danger of collision. Apparently she either miscalculated the distance, or put off the effort to take the tow to the eastward until it was too late.

A decree for the libelant may be entered, with costs.