THE ATKINS HUGHES. THE CADDO. THE BAYAMO.

(District Court, S. D. New York. October 25, 1912.)

1. COLLISION (§§ 69, 76*)—STEAMSHIP AND TUG WITH TOW—MUTUAL FAULTS —"VESSELS IN SIGHT OF ONE ANOTHER."

As a tug, with a barge in tow on a hawser, was passing out to sea through the main ship channel from New York Bay in the daytime, the barge came into collision with the steamship Bayamo off the quarantine anchorage. The Bayamo had been anchored, and was going astern into the channel to get on her course up the harbor. As the tug passed the stern of another anchored steamship, she saw the Bayamo a quarter of a mile away on her starboard bow moving astern, and gave a signal of two blasts and starboarded, going close under the stern of the steamship, which had nearly stopped; but the barge was unable to turn so quickly, and struck the Bayamo's starboard quarter. Held, that the barge was not in fault, it appearing that she followed the course of the tug as closely as possible; that the tug was in fault for being too close to the anchorage line without necessity; that the Bayamo was also in fault for violation of article 28 of the Inland Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 102 [U. S. Comp. St. 1901, p. 2884]), which required her, on going astern, to indicate that fact by three short blasts on the whistle, since, although there was an intervening vessel, the tug could have been seen from her stern, and the vessels were "in sight of one another," within the meaning of the rule.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 87–90, 124–137; Dec. Dig. §§ 69, 76.*]

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

2. COLLISION (§ 69*)—CARE TO PREVENT—VESSELS PASSING QUARANTINE AN-CHORAGE.

Vessels passing quarantine anchorage in New York Harbor, where ships customarily stay but a short time, are in much the same position as those going down a narrow channel in front of slips out of which

vessels are likely to emerge, and are required to exercise the same high degree of care.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 87–90; Dec. Dig. § 69.*]

**3. COLLISION (§ 76*)—RULES FOR PREVENTING—REVERSING SIGNALS—VESSELS LEAVING ANCHORAGE.**

Article 28 of the Inland Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 102 [U. S. Comp. St. 1901, p. 2884]), which requires that "when vessels are in sight of another a steam vessel under way whose engines are going at full speed astern shall indicate that fact by three short blasts on the whistle," applies to a steam vessel going astern on leaving anchorage preparatory to laying her course.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 124–137; Dec. Dig. § 76.*]

**4. COLLISION (§ 69*)—CARE TO PREVENT—VESSEL LEAVING ANCHORAGE.**

A vessel leaving anchorage grounds and backing into a channel in the way of other vessels navigating it is bound to exercise extreme care to notify them, and to that end to maintain a very careful lookout; and she is not relieved from liability for a collision because no other vessel was seen from a portion of the ship admittedly obscured by another vessel in proximity.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 87–90; Dec. Dig. § 69.*]

In Admiralty. Libels for collision by the Compania Cubana de Navigacion, owner of the steamship Bayamo, against the steamtug Atkins Hughes and barge Caddo, and by the Texas Company, owner of the Caddo, against the Bayamo and Atkins Hughes. Decree for the Texas Company against both the Bayamo and Hughes.

On the morning of February 27, 1911, in clear weather, with a light wind and flood tide, the barge Caddo, owned by the Texas Company and in tow of the tug Atkins Hughes, came in collision with the steamship Bayamo off Quarantine Anchorage, New York Harbor.

The Bayamo had just left her anchorage at Quarantine, was engaged in straightening out on her course to go up the harbor, and was struck by the Caddo before she had accomplished this manœuver, and while she was athwart the channel at an angle which will be considered in the opinion herewith.

The Atkins Hughes and her tow were bound to sea, and the tug herself escaped collision only by putting her wheel hard astarboard and passing under the Bayamo's stern. The Caddo did not succeed in turning so quickly, and the bluff of her starboard bow came in contact with the extreme starboard quarter of the Bayamo, to the injury of both vessels.

The owners of the Bayamo sued both the Atkins Hughes and the Caddo, and the owners of the Caddo sued both the Atkins Hughes and the Bayamo. The actions were tried together.

Chas. C. Burlingham, of New York City, for the Bayamo.
Samuel Park, of New York City, for the Atkins Hughes.
John W. Griffin, of New York City, for the Caddo.

HOUGH, District Judge (after stating the facts as above). [1] Of the claim against the Caddo, it is enough to say that the only fault alleged against that barge is that she failed to follow, or attempt to follow, her tug, and thereby caused or contributed to the damage. There is no evidence worthy the name that the Caddo did

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

not do her best to steer after her tug, and it follows that the libel as against her must be dismissed, and that she is plainly entitled to recover for her injuries against one or both of the steam vessels.

The vital and salient point of difference between the navigators of the Hughes and those of the Bayamo is on the apparently simple question whether, as the Hughes came down the Main Ship Channel, bound to sea and steering a straight course, she had the Bayamo on her port or starboard bow; and before any application of legal principles can be made to the facts this question must be answered.

Before its solution is attempted, the evidence shows some facts which are of assistance and are not (I think) open to doubt.

On the morning in question, and before the Hughes started down the bay, there were two vessels at anchor off Quarantine, and another one somewhat north of them. With the most northerly of these anchored vessels this case is not concerned; but it is important to ascertain the positions of the other two, whereof the Atlanta was furthest up the bay, and the Bayamo to the south of her.

Most of the witnesses testified in court, the good intent of none of them was impeached, and all seemed to me to be trying to tell the truth as they saw it.

Under such circumstances, the greater weight must be given to those witnesses whose experience is most useful, and whose business especially required them to take note of that to which they testified.

Applying this rule, the Sandy Hook pilot (Butler) who had the Bayamo in charge gives, in my judgment, convincing testimony as to where he anchored that vessel. He says she lay off Pennsylvania avenue, Staten Island, and was distant about 1,000 feet therefrom. The steamship is 350 feet long, and under the influence of the tide was tailing "about northeast," and "toward Bay Ridge." Tailing to the northeast gives a direction somewhat to the north of Bay Ridge, but the two statements are not wholly inconsistent. When this location is tested by the chart, and the other evidence, it is persuasive that the Bayamo was at anchor in such manner that, as she swung to the tide, her stern was just about on the line of Quarantine Anchorage, and she lay not quite southwest and northeast; i. e., with her stern pointing between northeast by east and east-northeast.

The Austrian steamship Atlanta was similarly anchored a quarter of a mile north of her. The Atlanta's stern likewise was substantially on the line of Quarantine Anchorage, and she was about the same distance from the shore as was the Bayamo.

The testimony as to the distance between the Bayamo and Atlanta is not altogether harmonious; but here, again, I prefer the estimate of Butler, whose business it was to anchor the Bayamo, and to see that she had a safe berth; and his estimate is confirmed by Capt. Futcher of the Hughes, whose estimates of distance are not always the same, but he finally settled upon a quarter of a mile as the distance between the two steamships.

The line of Quarantine Anchorage is not a prolongation of the eastward boundary of General and Man of War Anchorages. It changes to the eastward by 20 degrees. From this it follows that,

to an observer coming down the Main Channel and near to the line of General Anchorage, the Bayamo's stern would be projecting beyond that of the Atlanta, although both the vessels were well within lawful Anchorage grounds. This is due to the change in compass direction of the boundaries of General and Quarantine Anchorage as above noted.

That, as matter of fact, those on the Atkins Hughes (or some of them) did see the stern only of the Bayamo at first, is shown by the testimony of the mate, Collins, and his evidence is also confirmation of that from the Bayamo that the Atlanta, having much greater freeboard than the Bayamo, obscured the view up the bay from the Bayamo's bridge; but it follows, also, from this evidence that a competent observer on the stern of the Bayamo would have had a view of affairs up the bay which might have been of great service to safe navigation.

While the two steamships lay at anchor as above stated, the Hughes, with the Caddo in tow upon a hawser, came out of the Kill van Kull, and, rounding the Anchorage Buoys, steered down the harbor. Her crew insist that they took the middle of the channel. This statement rests principally upon the evidence of Capt. Futcher, not because others have not spoken, but because he was at the wheel of his boat, and was the man presumed to have knowledge of local conditions. His acquaintance therewith seems to me very imperfect. Of the land he knew little, and the impossible place which he marked as the spot of collision on the chart does not encourage confidence in the accuracy of his observations. On this point the master of the Caddo has given a deposition, and his estimates of courses and distances may fairly be characterized as absurd.

It is believed that the Hughes came down the harbor on or very near the line of General Anchorage. The largest estimate of the distance by which she cleared the Anchorage Buoys (at the Kills) is from 300 to 400 feet, and the Caddo's master declares that he cleared it by 40 feet only. He would naturally pass nearer than did his tug. It was his especial business to keep away from such obstacles as buoys, and I am of opinion that in this respect he is nearly right. But whatever the course of the Hughes was, when she rounded into the Main Ship Channel her navigators are positive that they laid a straight course, and kept to it until they were under the stern of the Atlanta. There being no doubt on the evidence that the Hughes passed the Atlanta's stern within 200 or 300 feet, it follows that she must have come down the bay very near the Anchorage line.

Before the Hughes got abeam of the Atlanta, the Bayamo had started full speed astern to execute the maneuver first above stated. She had moved backwards "300 feet," or "about a length," when those on her bridge saw the Hughes emerging from under the stern of the Atlanta. Immediately (according to the Bayamo's evidence) the Hughes blew two whistles and starboarded her wheel, whereupon the Bayamo instantly put her engines full speed ahead, but continued, however, to go astern approximately two lengths more, being still in the water, but having gained no headway before collision.

The Hughes passed within a distance variously estimated from 40 to 125 feet of the Bayamo's stern, and the Caddo fell into collision.

Admittedly the Bayamo never blew any whistles. The reason given therefor is that whistles would have done no good, for, as soon as the Hughes blew two whistles and starboarded, collision was almost inevitable.

The only variant from this story (so far as yet related) on the part of the Hughes is that she had gotten below the Atlanta, and within perhaps 700 or 800 feet of the Bayamo, when she observed the steamship's sternward movement, and then it was that she blew two whistles and starboarded.

Although there is this much agreement between them, each set of navigators avers that the other solely caused the collision; because Capt. Futcher and his crew maintain that, when they were under the stern of the Atlanta, the Bayamo, apparently at rest in the water, bore from two to three points on their starboard bow, while the Bayamo's witnesses declare that at the same time the tug had the steamer (then actually making sternway) nearly, if not quite, as much on her port bow.

Even in collision cases this difference is astonishing, and when, as above noted, all the witnesses seem to be trying to tell what they saw, correctness must be tested by the rule of probability. If a diagram be made according to the evidence of Capt. Futcher, and the Bayamo be placed 2½ points on his starboard bow when he was about 200 feet off the Atlanta's stern, the Bayamo is found to be such a distance from the course of the Atkins Hughes as to make collision under all the rest of the evidence impossible, and she is likewise placed at a distance to the westward of the line of Quarantine Anchorage inconsistent with all the other evidence. Indeed, this testimony puts her so far westward that she ought to have been seen across the Atlanta's bow long before the Atkins Hughes got abeam of that ship.

As to the Bayamo's story, it is obviously quite difficult for observers on the Bayamo's bridge to accurately state the bearing of their own ship from the pilot house of the Atkins Hughes. Therefore Pilot Butler was asked to give the bearing of the Hughes in points off his own bow when she was first seen. He answered slowly, and examined the chart, and finally said that, when the Hughes came in sight, she was 6 points off the Bayamo's starboard bow. To this position he adhered. This statement likewise is impossible, for it places the Hughes far to the westward of the Atlanta.

It may be noted here that the Hughes was progressing at about 5½ miles, so that from the time she was abeam of the Atlanta until the collision happened could not have been more than 2½ minutes, and was probably considerably less.

The inference from the foregoing is that the apparition of danger was so sudden that both sets of observers are more than usually inaccurate. From all the evidence I deduce the following: Though the Hughes may have seen, and probably did see, the stern of the Bayamo while some distance up the bay, no attention was paid to her until the tug was abeam of the Atlanta. Before that time the

Bayamo had begun to move astern, and was continuing so to do when the vessels were a quarter of a mile apart. At that time the Hughes was heading for the Bayamo, and probably for her starboard quarter. Then, or a few seconds later, the Hughes blew two whistles and starboarded steadily until she had a hard astarboard wheel. By this manoeuver she changed her own course at least five points and barely escaped collision. The Caddo changed her course about two points, a finding substantiated by the angle of collision as stated by Capt. Seeley of the Bayamo.

On these facts the Hughes is plainly liable. Her master acted under an erroneous view of the law. When he saw the Bayamo moving astern, and on his own starboard bow, he considered that the vessels were on crossing courses, that the Bayamo was the privileged vessel, and he therefore blew two whistles. The Servia (D. C.) 30 Fed. 503; Id., 149 U. S. at 156, 13 Sup. Ct. 877, 37 L. Ed. 681.

That a mariner wrongly interprets the rules of the road does not put his vessel in fault, if what he actually did was careful and prudent. This captain had presented to him a case of special circumstances. He had seen at least the stern of the Bayamo. He ought to have known that she was at Quarantine Anchorage, and to have appreciated the fact that vessels lying there stay but a short time, and are likely to move at any moment. There was nothing to prevent him from going farther out in the channel, instead of which he pursued a course (as I believe) which produced danger of collision if the Bayamo had remained still, and then, when he saw her moving, he deliberately got in her way.

[2] Vessels passing Quarantine Anchorage are in much the same position as those going down a narrow channel in front of slips out of which vessels are likely to emerge. Cases like The American Eagle (D. C.) 29 Fed. 302, are applicable.

[3] Nor is it possible to absolve the Bayamo from fault. Article 28 of the Inland Rules requires that:

"When vessels are in sight of one another a steam vessel under way whose engines are going at full speed astern shall indicate that fact by three short blasts on the whistle."

The difference between this and the corresponding International Rule is significant, in that this regulation does not require a vessel under way to be upon a course.

The Bayamo was under way when she hove up her anchor and started astern, because she was neither "at anchor, nor moored fast to the shore, nor aground." Therefore she was bound to sound three whistles for the benefit of vessels who were in sight of her.

It is believed that the Atkins Hughes was not in sight of those on the Bayamo's bridge. Their view was obstructed by the Atlanta; but it is also found that the Hughes was in sight of any lookout stationed at the steamship's stern.

[4] The obligation of maintaining a very careful lookout on leaving anchorage or mooring is elementary, and navigators cannot take refuge in the proposition that they have no vessel in sight, because

nothing is seen from a portion of the ship admittedly obscured by another vessel in proximity.

Within the meaning of the statute, therefore, the Bayamo and the Hughes were in sight of each other when the steamship started backing. The steamship should therefore have sounded three whistles, and, not having done so, the burden of proof is on her to show that failure to comply with the statute did not cause or contribute to collision. So far from doing this, the evidence is thought to show affirmatively that, had she blown, and had the Atkins Hughes heard, there was plenty of time and ample room for the Hughes and her tow to pass across the bow of the steamship. I think the language of The Sicilian Prince (D. C.) 128 Fed. 136, is applicable, viz.:

"Any vessel backing across a channel in the way of other vessels navigating it is bound to exercise extreme care to notify the other vessels of her manœuver."

Damages and costs will be divided between the Hughes and the Bayamo.