**UNITED STATES v. SHAW, SAVILL & ALBION CO., Limited.**

No. 58, Docket 21424.

United States Court of Appeals
Second Circuit.

Argued Nov. 3, 1949.

Decided Dec. 27, 1949.

Dow & Symmers, New York City, John F. X. McGohey, U. S. Atty., New York City, Max Taylor, Sp. Asst. U. S. Atty., New York City, and Herbert E. Ost, New York City, for the United States.

John Sheneman, New York City, for Kingdom of Belgium.

Burlingham, Veeder, Clark & Hupper, New York City, Eugene Underwood, New York City, for Shaw, Savill & Albion Co., Limited.

Before L. HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The United States, as owner of the ship, George N. Seger, and the Kingdom of Belgium, as a shipper, appeal from a decree in the admiralty, holding her solely liable for a collision on the night of December 28, 1945, off the Ambrose Lightship, with the ship, Waipawa, owned by the claimants, Shaw, Savill & Albion Co., Ld. Since the United States and the Kingdom of Belgium concede that The Seger was at fault, the appeal is limited to whether The Waipawa was also at fault. The following is an outline of the facts, as established by the testimony, substantially all of which was taken by deposition. The Ambrose Lightship is about three miles away from the Gedney Buoy, which is on the prolonged line of the Ambrose Channel. The Seger, bound out, after dropping her pilot near the buoy, laid a course 130° true, on which she would have passed the Lightship on her port hand by a margin of about a quarter of a mile; it was her purpose to round it on a left rudder and set her course eastward. The Waipawa, bound in from Glasgow, was on a course, 267° true, intending to round the Lightship on her starboard hand and take on her pilot in the neighborhood of the buoy. By three changes of helm, none of which she announced by signal, she changed her heading 28° to starboard, so that she was headed 295° true when she first made out The Seger at 7.29 P.M. The distance apart of the vessels at that time can be ascertained from their two speeds and from the fact that the collision occurred not later than 7.35½. During substantially all the interval of six and a half minutes The Waipawa was at slow speed—seven to seven and a half knots—; The Seger was at full speed—eight to nine knots—for the first five minutes, and for the last minute and a half her engines were backing. If we allow to The Waipawa an average speed of seven and a half knots and to The Seger an average of eight and a half knots, the vessels were approaching at a joint speed of sixteen knots, and were about two miles apart at 7.29. The place of collision was about a quarter of a mile off, and about south by east of, the Lightship. About a minute and a half before collision The Waipawa changed her helm first by a half right rudder, and about forty seconds later by a hard right rudder. Assuming a speed of seven and a half knots at the first change, her average speed could not have been more than seven knots for the minute and a half in question, especially as her starboard engine was either stopped or reversed. She could not have moved more than 1050 feet or 350 yards, and, even under a hard over helm, her stern would not have left her course at the moment of collision, although she might have changed her heading as much as 30°. Thus the collision must have happened substantially on The Waipawa's course.

The Seger saw The Waipawa considerably before The Waipawa saw The Seger, and, according to her own testimony, saw her green light only. This must have been true, even though The Waipawa is right that when she first made out The Seger at 7.29, The Seger must have seen both lights of The Waipawa; in other words even though she was then dead ahead of The Waipawa. The Waipawa argues that The Seger crossed her bows, else she could not have struck the Waipawa on her port bow, while The Waipawa was substantially on her original course; and that this is further confirmed by the succession of left rudders which The Seger concededly executed. The Seger's own testimony as to these was as follows. She supposed that The Waipawa meant to cross her bows, and at a time, which her master estimated at 7.31½,[1] she changed her course five degrees to port and this she followed by a change of fifteen degrees more, which brought her on a course, 110°, almost parallel to The Waipawa's. It is impossible to be sure just when these orders were given, or when the ship responded to them so as to steady on the new courses, if she ever did. Her witnesses put the collision at 7.35½, and at some time before she had put her rudder hard left and had given the order to reverse. On her

1. We assume that the time of collision as recorded by both vessels is a dependable datum, and, if so, their clocks were eleven and a half minutes apart: we have uniformly corrected Seger time correspondingly.

own testimony The Seger was therefore for four minutes upon a course gradually curving to port under her successive left rudders. Her speed of between eight and nine knots we may take at eight and one half knots, and, except as the backing of her engines reduced it, she would have travelled 3400 feet after she began to swing to port. Her engines could not have been in reverse more than a minute and a half, so that, if we assume that she covered about a half a knot from the time she made her first change of helm, it will be as near to the truth as the evidence permits; during all this time she must have borne on The Waipawa's port bow.

█ The Seger has the burden of proving The Waipawa's fault, and, since she was herself grossly at fault, that burden is more than ordinarily heavy.[2] On the whole evidence we find that, when at 7.29 The Waipawa first made out The Seger, The Seger was either dead ahead, or so fine upon The Waipawa's starboard bow that she crossed The Waipawa's course very shortly thereafter. How far under her curving course The Seger was carried to port of her original course—130°—it is impossible to say. A change of five degrees followed by one of ten would not accomplish much in the two or three minutes which elapsed until she put her helm hard left. Moreover, this is confirmed by the fact that she still thought that The Waipawa was crossing her bows, and by the further fact that The Waipawa did not observe any change. Her hard over left rudder, even though followed by a reversal of the engine, did not stop her swing to port, though it somewhat checked it. Knight says that, if "the ship had actually begun to swing * * * she will in most cases continue * * * although much less rapidly than if the screw had not been reversed."[3] We find that The Seger having crossed the projected course of The Waipawa over half a knot in advance of the place on that course at which the collision took place, swung slowly to port of her original course and finally by a hard over left rudder invaded The Waipawa's water and struck her port bow.

█ These being the facts, the only possible fault of navigation of The Waipawa was that, being by hypothesis the burdened vessel, she did not make enough allowance for The Seger's possible deviation from her duty to keep her course and speed; that is, that she was guilty of "close shaving."[4] At the outset we may dispose of the argument, that The Waipawa should have observed The Seger's slow curve to port by which she was continuously approaching The Waipawa. It was night, and, since The Seger's red light alone was visible, changes in The Seger's course could be detected only by variations in the distance between the range lights. The after light was at least fifteen feet above the forward one, and if the mast were a hundred feet apart, at the distance of a quarter of a mile they would have been only two or three degrees apart. We are not prepared to hold that it is evidence of an insufficient watch not to detect variations in so small an angle, and that was all that could advise The Waipawa of The Seger's edging in upon her course. Moreover— and this is the strongest circumstance of all—The Seger three or four times put her rudder right without giving the required signal. Certainly that justified an inference that she was not changing her course. We have no disposition to minimize "close shaving" as a fault. The Waipawa had open water to starboard; she could have passed the Lightship on her port hand; indeed she could have cut down the distance by which she planned to pass it. The question is not whether anything prevented her from giving The Seger a wider berth, but whether anything called upon her to assume that a wider berth was necessary. We are to consider the situation as it appeared from The Waipawa's bridge. She saw a vessel cross her bows when the two ships were at least a mile apart. The vessel was on a course, which, had she kept it as was

2. The Victory, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519.
3. Knight on Modern Seamanship, 7th Ed., p. 318.

4. The Benefactor, 102 U.S. 214, 218, 26 L.Ed. 157; The Newburgh, 2 Cir., 273 F. 436; The Osseo, Fed.Cas.No.10,608; The John Brotherick, 8 Jurist 276.

her duty, would have put nearly two lengths of The Waipawa between them when they passed. The Waipawa had therefore certainly fulfilled her duty to "keep out of the way" as things stood. The collision happened because The Seger totally misapprehended the situation, and supposed without shadow of excuse that The Waipawa was crossing her bows. What reason had the Waipawa to expect that? It would be wholly unfair to assume that she should have anticipated so mad an antic on The Seger's part.[5] When all is said, it is the precise purpose of the Rule that the burdened vessel may rely upon the privileged vessel's keeping her course. We hold that The Waipawa was not guilty of "close shaving."

■■ The Seger finally argues that The Waipawa should have made her out earlier than she did, and that, if she had, and had blown every time she changed her course from 267° to 295°, The Seger would have known that she was turning to starboard, and would not have tried to cross her bows. The Waipawa's excuse is that she could not see The Seger's lights because they were blurred against the background of the city lights which lay behind; but this The Seger challenges as inadequate. The judge accepted it, but, since he saw none of The Waipawa's witnesses, he was in no better position than we are to know the truth. We must own that it appears to us somewhat strange that The Seger's lights should not have been as discernible as the pilot vessel's which were much further away and which The Waipawa apparently had no difficulty in seeing. On the other hand, as we have already said, The Seger had an unusually heavy burden of proof, and she did not call any witnesses to show that the bank of city lights will not have the effect which The Waipawa's witnesses said that they did. Certainly it is highly probable that the white range lights would be so confused, although they must be visible for five miles.[6] The statute [7] requires the red running light to be visible for "at least two miles", and it is possible that The Seger's could have been seen no further. If it could have been, The Seger should have so proved. True, the statute [8] also requires the red pilot light to be visible for only "at least two miles"; but the red light on the pilot boat may have been stronger; and that too The Seger should have disproved, before she could contrast the two. However, even if the lights were of the same strength, the argument would not be convincing that The Waipawa was negligent in failing to make out The Seger, because she did make out the pilot boat's red light. The fourth officer knew that the pilot boat "was hanging around, just behind the light vessel, and I couldn't pick her out then, but we sent up the flares, we had an idea she was there. We saw some red and white lights which indicates a pilot vessel." He saw her "immediately we sent up the flares." It is not in the least surprising that, being in search of the boat and knowing her general location, he should have seen a red light only eight feet below the masthead, and yet failed to notice a red light which he had no reason to expect and which was only twenty feet or so above the water. However, the issue is irrelevant anyway, for The Waipawa did make out The Seger when the vessels were two miles apart, and we are not satisfied that due care required her to discover her earlier. The Rules do not define when they shall become applicable, nor would it be possible to do so. They do apply "from the time the necessity for precaution begins",[9] and there is no reason why they should begin earlier. The last change of course of The Waipawa was at 7.27, eight and a half minutes before the collision; it is at least doubtful whether the "necessity for precaution" had as yet "begun." Whether, if it had, and if The Waipawa had blown a signal at the time of that change, it would have had any effect upon The Seger's navigation, is a question which we need not answer.

Decree affirmed.

5. The Free State, 91 U.S. 200, 205, 23 L.Ed. 299.

6. § 72 (a), Title 33 U.S.C.A.

7. § 72 (c), Title 33 U.S.C.A.

8. § 78, Title 33 U.S.C.A.

9. The Pacific, 21 How. 372, 384, 16 L.Ed. 144; The Wenona, 19 Wall. 41, 52, 22 L.Ed. 52; The Breakwater, 155 U.S. 252, 264, 15 S.Ct. 99, 39 L.Ed. 139.