**STANDARD OIL CO. OF NEW JERSEY v. UNITED STATES.**

**UNITED STATES v. STANDARD OIL CO. OF NEW JERSEY.**

**THE S. S. ESSO CHARLESTON. THE S. S. THOMAS W. HYDE.**

United States District Court
S. D. New York.
July 14, 1950.

Kirlin, Campbell, Hickox & Keating, New York City (Edwin S. Murphy, Raymond T. Greene, and Walter L. Hopkins, all of New York City, of counsel), for libelant and cross-respondent.

. Irving H. Saypol, United States Attorney, New York City (Louis E. Greco, Attorney, Department of Justice, New York City, and Rowland F. Schlegel, New York City, of counsel), for respondent and cross-libelant.

LEIBELL, District Judge.

The above cross-actions in Admiralty were instituted as the result of a collision between the S.S. Thomas W. Hyde and the S.S. Esso Charleston in Oran Bay, North Africa, April 30, 1944. In A. 142–211 the Standard Oil Company alleges two causes of action; the first for collision damages and the second for war risk insurance. In A. 146–59 the United States pleads a cause of action for collision damages and the Standard Oil Company claims a set-off, based on war risk insurance, against any recovery of the cross-libelant, the United States. At this time I will not pass upon the cause of action and set-off of the Standard Oil Company based on war risk insurance, because there is now pending in the United States Supreme Court an appeal involving the extent of coverage of the standard form of war risk insurance policy, in a case which was before the United States Court of Appeals, Second Circuit, United States v. Standard Oil Company of New Jersey (The John Worthington), 178 F.2d 488, in which the United States Supreme Court granted a writ of certiorari, 339 U.S. 977, 70 S.Ct. 1021.

On the collision claim I have found both the Hyde and the Charleston guilty of faults which brought about the collision and caused the resulting damages. The owner of the Charleston claims collision damages of $10,000 and the owner of the Hyde claims collision damages of $50,000. The damages being divided, it is evident that the Standard Oil Company would have to pay the United States something in excess of the damage sustained by the Charleston. The interlocutory decree on the collision claims will provide that no steps shall be taken to enforce them until the further order of this Court. This Court will not make findings of fact or conclusions of law on the war risk insurance claim and set-off of the Standard Oil Company until the Supreme Court rules in The Worthington case. The facts on which the war risk insurance claim and set-off are based are for

the most part uncontested and evidenced by documents marked as exhibits, so that only a question of law will remain to be decided in these two Admiralty actions after the Supreme Court decides The Worthington case.

Findings of fact and conclusions of law are being filed herewith on the collision causes of action. Of course, meanwhile either party or both may appeal from the interlocutory decree which will be entered on the collision causes of action. I will now discuss the material facts in relation to the collision.

On April 30, 1944 at about 7:25 P.M. (double summer time, 2 hours ahead of standard time) a collision took place in the outer harbor or bay of Oran between the Liberty ship, Thomas W. Hyde and the tanker Esso Charleston. The collision occurred in the late afternoon of a clear, calm day. No natural forces were in any way responsible. The ships were seaworthy. It was the human element that failed.

Another Liberty ship, the Pierre Gibault and the Charleston were on parallel courses and making 1 or 2 knots maintaining steerageway. All three vessels were part of a large trans-Atlantic convoy from which about thirty vessels were detached to enter the bay of Oran at about 6:30 P.M. The Master of the Hyde, when well to starboard and half a mile ahead of the Gibault and the Charleston, started on a long left turn at 7:08 and continued on that turn until 7:18½. He then set a course about southeasterly for the buoy at the end of the breakwater forming the inner harbor of Oran. He set that course when only 1000 yards from the Gibault and while the Hyde was making at least 6 knots. The course he set cut in on the projected southwesterly courses of the Gibault and the Charleston to such an extent that he should have known that those two vessels would be forced to go astern in order to be sure to avoid the on-coming Hyde. There was no need for any such navigation on the part of the Hyde. She could have ended her long left swing before 7:18½ and could have set a course for the Oran breakwater, that would have taken the Hyde across the projected southwesterly courses

of the Gibault and Charleston clear of their bows by 500 or 1000 yards. The Hyde was guilty of "close shaving". Britain S. S. Co. v. J. B. King Transp. Co., 2 Cir., 1904, 131 F. 62, 63; The John F. Gaynor, D.C.E.D.Pa.1902, 115 F. 382; The Atkins Hughes, D.C.S.D.N.Y.1912, 199 F. 938, 943; United States v. Shaw, Savill & Albion Co., 2 Cir., 1949, 178 F.2d 849. If the Master of the Hyde had followed the orders of a PC boat, given at 7:11 to follow the PC craft, the Hyde would have cleared the Gibault and Charleston by a 1000 yards.

The course the Hyde set for herself entailed such risk that the Hyde cleared the bow of the Gibault by only 100 feet, with the Gibault going astern. The Charleston had steam turbine engines. They take longer to get into reverse. It would require a minute to get the Charleston moving astern from a position dead in the water. The Charleston had been going ahead at little better than a knot.

From 7:18½ on, the situation presented was a crossing situation, not one of special circumstances. The Gibault and the Charleston were on parallel courses headed southwesterly, about 237° true, in the direction of Mers-El-Kebir, proceeding at between 1 and 2 knots. The Hyde was on a southeasterly course, headed for the buoy, located off the end of the breakwater at the entrance to the inner Oran harbor. The vessels were in sight of each other and could observe each others' courses. The fact that the Gibault and the Charleston were just maintaining steerageway while the Hyde was making 6 knots did not change the situation into one of special circumstances to which the precautionary rules, International Rules, Arts. 27, 29, 33 U.S.C.A. §§ 112, 121, would apply. The special circumstance rule is the exception. See cases cited in Griffin on Collisions, pp. 27–29, § 19.

The Gibault was in a better position to observe the Hyde's movements than was the Charleston which was on the portside of the Gibault with her bow about amidship of the Gibault. The tanker was, of course, lower in the water. Her freeboard was about four feet. But her flying bridge or top deck above the wheelhouse afforded

a good view. Those in charge of the Gibault saw the danger in time to put her engines astern and got out of the way. But the lookout on the Charleston did not report the Hyde until the Hyde was crossing the bow of the Gibault, and the Charleston's captain did not see the Hyde until after the Gibault blew a 3 blast backing signal. Int.Rules, Art. 28, 33 U.S.C.A. § 113. Then the Master of the Charleston blew 4 blasts (an inland danger signal) ordered the Charleston's engines astern plus a jingle, and kept her rudder amidships. If those in charge of the Charleston had been more alert they could have seen the masts and stack of the Hyde approaching the Charleston on a crossing course. The movement of the Hyde's masts and stack in relation to the Gibault's should have been seen above the hull of the Gibault. Canadian Aviator v. United States, 2 Cir., 154 F.2d 825. As the burdened vessel on a crossing situation it was the Charleston's duty to keep out of the way. Int.Rules, Art. 19, 33 U.S.C.A. § 104.

After the Hyde crossed the Gibault's bow, the Master of the Hyde put her engines astern, blew 3 blasts, and put her rudder hard left. Because of her speed, 6 knots, the Master's orders had the effect of throwing the Hyde's stern to starboard and her bow to port. The distance between the Gibault and the Charleston was about 350 yards. The Hyde's rudder and backing action threw her bow partly across the bow of the Charleston, but the Charleston's bow, swinging about 8° to starboard, contacted the port side of the Hyde and raked it for a distance of thirty feet along the boat deck. The backing of the Charleston's engines caused her bow to go to starboard. At the time of the collision the Charleston had checked her forward motion and was about to go astern. The Hyde still had plenty of speed and after the contact continued on to the inner harbor of Oran without stopping.

■ The captain of the Hyde testified that he had the Charleston under observation at all times, from the time he started his left swing at 7:08. If so then he failed to take precautionary measures in time and avoid getting too close. Further, he did not put his engines astern until the collision was unavoidable. It was his duty to avoid the risk of collision. If he had any doubt about the Charleston's course and speed he should not have set his course so as to cut her off so sharply. The Hyde did not set a definite course for the Oran buoy until 7:18½ when she completed her left turn. Until then the Hyde was not on a fixed course. The collision with the Charleston occurred at 7:25. A crossing situation did not develop until five minutes before the Hyde crossed the bow of the Gibault, when the Hyde was about 1000 yards from the Gibault. But that was sufficient time and distance to make the Hyde's course fixed. The Steel Inventor, 2 Cir., 43 F.2d 958. The starboard hand "rule presupposes that both vessels shall be in sight of each other and can continually check each other's positions." Erie R. Co. v. The Invader, 2 Cir., 159 F.2d 648, 649, citing Lind v. United States, D.C., 156 F. 2d 231.

■ Although, on a crossing situation, a privileged vessel, such as the Hyde, is required by the International Rules, Art. 21, 33 U.S.C.A. § 106, to hold her course and speed and the burdened vessel (the Gibault and the Charleston) must keep out of the way, the rule does not give the privileged vessel the right to continue on her course and maintain her speed until a collision is unavoidable. Yet that is what the Hyde did. The privileged vessel is required to avoid any clear risk of collision and to take action to avoid it when actual danger of collision becomes apparent. She has no right to use her privilege to produce or assist a collision. The Tenadores, 2 Cir., 298 F. 740; The Republic, D.C., 102 F. 997; The Aurania, D.C., 29 F. 98, 125. There is no right of way into a collision. The Quogue, 2 Cir., 47 F.2d 873. If the holding vessel does not take action soon enough she will be held at fault. See cases cited on p. 155, § 51 of Griffin on Collisions.

There was considerable testimony about blinker messages which the Master of the Hyde testified he had ordered sent to the Gibault and the Charleston, advising them that the Hyde was going to cross their bows, entering Oran by order of the Port

Director. No written record was ever made of the messages. The signalman of the Hyde testified that he sent them and got an acknowledgment of them from both the Gibault and the Charleston. No one from the Gibault testified to receiving the message. In fact only the Mate from the Gibault, Tobiason, was examined as a witness. His deposition was taken May 14, 1947. Government's counsel stated at the trial in January 1950 that he first heard about the blinker messages from the Hyde to the Gibault and the Charleston a few weeks before the trial when he contacted the signalman on the Hyde. Those blinker messages were not mentioned in any reports of the accident made by the Master of the Hyde, or by any one else. The signalman of the Charleston denies having received any such message from the Hyde and testified that when the message was alleged to have been sent about 7:19 or soon thereafter, he was watching the shore tower for blinker messages as to where the Charleston was to anchor. The position of the Charleston, with her bow about amidships of the Gibault and with the Gibault between her and the Hyde, would make it difficult to send a blinker message over the hull and between the masts and stack of the Gibault. Further, the Navy signal liasion officer on the Hyde testified that while the signalman was operating the port signal light he spoke to him to have him come to the port side and receive a message from the shore tower which was completely received and acknowledged at the very moment of the collision at 7:25 P.M. I have concluded that the Charleston never received any blinker message from the Hyde, although the Gibault probably did.

The Hyde's smooth log, and the report of her Master (Hansen) to the Naval authorities at Oran the night of the collision (April 30, 1944), and his casualty report soon after the accident, all refer to the Hyde's turning to head for Oran at 7:08 on a right turn. The Master's testimony on the trial and that of other witnesses for the Hyde was that the Hyde made a long left turn and that the log entry (repeated in later reports) was an error. I believe it was an error. There appears to be no reason why the Hyde should turn to the right on an arc of 270° when a left turn of 90° would suffice.

There were other but minor issues of fact concerning which testimony was taken. The Court's findings of fact cover them sufficiently. But I wish to note in passing that the report (Ex. G) made by the Master of the Hyde soon after the collision, on the night of April 30, 1944, in many respects is not in accord with his testimony at the trial, both in what it states and in what it fails to state.

An interlocutory decree should be entered as provided in the Conclusions of Law.