PARKER BROS. & COMPANY, Inc.,
Claimant of the Tugs GERTRUDE
and ANNIE O,

v.

**J. E. DE FOREST.**

No. 14965.

United States Court of Appeals,
Fifth Circuit.

March 30, 1955.

Sweeney J. Doehring, El Carol v. Greenwood, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel, for appellant.

Clarence S. Eastham, Houston, Tex., Eastham, Hinds & Dale, Houston, Tex., of counsel, for appellee.

**378**

Before BORAH, RIVES and TUTTLE, Circuit Judges.

RIVES, Circuit Judge.

This appeal in admiralty is from a decree of the district court holding appellant liable for half of the damages sustained by appellee's tug Florence, as a result of a collision which occurred on the evening of June 24, 1949, near Beacon No. 58, between the Lynchburg Ferry Crossing and San Jacinto State Park.

The tug Florence, owned and operated by appellee, was being used at the time of the collision for towing sand barges on the Houston Ship Channel. She was proceeding in an easterly direction down the channel, towing astern the empty barge, H-56. Near Beacon No. 59, she safely executed a starboard to starboard passing with a steamship proceeding up the channel, but afterwards failed to pull back over to her starboard or south side of the channel, and persisted in maintaining her north side of the channel where the collision subsequently occurred.

Immediately prior to, and at the time of the collision, an inexperienced deck hand, Edwin Mundine, was acting as helmsman for the Florence. While thus navigating the Florence and her tow over on the north side of the channel, Mundine sighted appellant's tug Gertrude followed by its tug Annie O, both of which were proceeding in the opposite direction up the channel, but made no effort to bring the Florence and her tow over to her proper south side of the channel because in his confusion he mistook the lights of the Gertude for those of the ferry across the channel near the mouth of the San Jacinto River, and remained on the north side of the channel in order to turn in a northerly direction into the River.

In the meantime, appellant's tugs, Gertrude and Annie O, continued navigating in a westerly direction up the channel with the tug Gertude in front and pushing the Barge PT-803, which was loaded with shell. Both of appellant's tugs were maintaining their proper starboard or north side of the channel. The Gertrude's Captain, Arthur Maxwell, was at the wheel and was also acting as lookout. No other person was acting as a separate or independent lookout either aboard the tug or the forward barge PT-803 at the time of the collision.

The collision occurred at about 9 P.M., but it is undisputed that the night was not very dark, the weather was clear, and visibility was good. There was no appreciable wind or tide, and all three tugs and their tows were displaying proper lights. When Maxwell observed the Florence over on the Gertude's north side of the channel, he sounded one blast on the Gertrude's whistle, calling for a port to port passing, which was the proper and safe passing under the circumstances. The testimony of Mundine aboard the Florence is that he never heard the Gertrude's whistle signal requesting a port to port passing, but the district court found that, as the only person aboard the Florence in a position to hear the signal, he probably did hear it sounded, but was so confused he did not recall or answer it. No other whistle signals were blown by either tug. After the Gertrude's one blast whistle signal, however, the Florence did change her course momentarily to starboard, or in the direction of her proper south side of the channel. The collision resulted when the Florence abruptly again changed her course to her port, and toward the north side of the channel, which last minute maneuver apparently threw her directly in the path of the oncoming Gertrude and her tow. Although the Gertrude reversed her engines, it was then too late to avoid a collision between the Gertrude's forward barge PT-803 and the Florence, as a result of which the barge being towed by the Florence, the H-56, overran her and caused the greater portion of the damages for which recovery is here sought. Though the Annie O rendered assistance to the damaged tug Florence, neither she nor her crew were

negligent, nor did they have any part in causing the collision or resulting damage.

From the above findings of fact, the district court concluded that the negligence of the Florence, and those in charge of her, in a number of respects proximately caused the collision,[1] and further found "that the 'Gertrude' and those in charge of her were negligent in one particular only, * that is in failing to keep a proper lookout and to have a proper lookout on the Barge PT-803." Concluding that the Gertrude's failure to maintain a proper lookout was probably a contributing cause of the collision, the district court held that this Court's decision in Smith v. Bacon, 5 Cir., 194 F.2d 203, required a division of the damages, and a decree to that effect was accordingly entered.

Appellant concedes being "virtually in complete accord" with most of the above findings, but insists that the district court erred in failing to find it entirely free from fault, and particularly in assessing against the Gertrude one-half of the damages sustained because of her failure to have "a proper look-out". In some twenty-four specifications of error, appellant argues, in effect, that the rule laid down by this Court in Smith v. Bacon, supra, which the district court sought to follow in finding the Gertrude mutually at fault, does not require or justify division of the damages under the facts here shown; that the admitted failure of the Gertrude to have a separate and independent lookout, other than her Captain and helmsman, Maxwell, either aboard the tug or on the forward barge PT-803, was not negligence, since the collision occurred on a clear night with excellent visibility in a wide channel, and while the Gertrude was pushing a single loaded barge only 175 feet in length; finally, conceding arguendo that the Gertrude was negligent in not having the separate and independent lookout supposedly required by the rule of the Smith case, supra, such negligence on her part could not possibly have been a contributing cause of the collision, since the district court found and the testimony conclusively reveals that Maxwell timely sighted the Florence and her tow, and was continuously aware of their every significant maneuver until the instant of collision, taking every avoiding action reasonably required or possible under the circumstances.

Appellee, while relying mainly for affirmance upon the prevailing rule of factual review for an appeal in admiralty[2] nevertheless insists via cross-assignments of error that a review de novo re-

---

1. Specifically, the court found:

"The 'Florence' was not in charge of competent persons.

"She failed to keep a proper, attentive, and good lookout.

"She failed to keep to her own starboard hand side of the channel.

"She failed to make a port-to-port passing which the circumstances presented required.

"She suddenly and without warning to the 'Gertrude' veered her course and that of her tow to port and across the course of the 'Gertrude' and tow.

"She failed to reply and agree to the one-blast signal timely blown by the 'Gertrude' for a port-to-port passing.

"She failed to blow any passing signal.

"She failed to effect a port-to-port passing when such passing was the only proper one under the circumstances presented.

"She failed to effect a port-to-port passing when she had not indicated a desire for a starboard-to-starboard passing.

"She failed to blow a passing signal to indicate that she was directing her course to port.

"She failed to timely and properly maneuver her engines and helm.

"She failed to sound a danger signal if those in charge of her did not consider that the port-to-port passing requested by the 'Gertrude' was safe and proper.

"She failed to sound a danger signal when it appeared to those in charge of her that a safe passing could not be executed, particularly if she maintained her course as she did.

"She failed to slow, stop or stop and reverse her engines reasonably.

"When danger of collision was or should have been apparent, she failed to take proper or timely precautions to avoid it."

2. See C. J. Dick Towing Co. v. The Leo, 5 Cir., 202 F.2d 850; McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6.

quires additional findings of fault on the part of the Gertrude proximately causing the collision which were not made by the district court, such as her alleged attempt to pass to port of the Florence against the latter tug's green running light indicating a starboard to starboard passing, and without ever having received any assenting whistle signal to her proposed port to port passing, as well as the Gertrude's failure to reduce speed, change course, blow a danger signal, or stop and reverse her engines until it was too late to avoid the collision. In any event, appellee insists that, because of appellant's admitted failure to station a separate and independent lookout either on the Gertrude or the loaded barge she was pushing ahead while navigating an open bend of the Houston Ship Channel at night, the district court was required, under the rule of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148, and this Court's decision in the Smith case, supra, to divide the damages for her contributing fault, though it erred in failing also to award appellee costs, or at least half his costs, in conformity with the decree below.

■■ We think the testimony fully supports the learned trial court's findings as to the fault of the tug Florence in causing the collision. We confess some doubt, however, as to whether, under this record, appellant's failure to have a separate and independent lookout aboard the Gertrude or the barge PT-803 was a statutory fault which proximately caused or contributed to causing the collision, within the rule laid down in Smith v. Bacon, supra. See also Zigler Co. v. Barker

Barge Line, 5 Cir., 167 F.2d 676. This Court did not intend, by its reaffirmation in Smith v. Bacon, supra, of the rule previously set forth in the Zigler case, supra, to lay down "an arbitrary rule requiring tug operators to maintain a lookout on the lead barge of every tow regardless of the circumstances," 194 F. 2d 206, even though the trend of these prior decisions admittedly has been to encourage strict compliance with the statutory rule requiring a "proper lookout" [3] in the interests of safe navigation in the towing industry. The wording of the rule itself, as well as the controlling facts upon which the Smith and Zigler decisions are based,[4] clearly reveal that a separate and independent lookout aboard a tug or the lead barge of its forward tow are not inexorable requirements of prudent tug navigation, but show that the question of competency of a lookout in any instance is primarily one of fact, to be realistically resolved under all of the circumstances attending a collision. True, the district court here found that "a lookout on her (barge PT-803) could have seen ahead better and farther than could Maxwell, the master at the wheel", and that "such a lookout probably could and would have seen the 'Florence' and her tow soon enough so that the collision would not have occurred," but we think appellant makes a strong showing that such findings were here unjustified as based on inference contrary to positive and practically undisputed testimony by Maxwell tending to reveal that the Gertrude's failure to have a lookout on the barge PT-803 had no part in causing the colli-

3. That rule, 33 U.S.C.A. § 221, provides:
   "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

4. Generally, the Smith and Zigler cases, supra, involved collisions caused by tugs with exceedingly long, multi-barge, for-

ward tows (600 and 400 feet respectively), navigating narrow channels on dark nights under conditions where the lookout of the pilot house helmsman was manifestly inadequate for safe navigation under all the circumstances attending the collisions. Here, it is practically undisputed that the Gertrude was pushing a single, loaded barge only 175 feet in length, and that the collision occurred in a wide channel on a clear night while visibility was good and the lookout-helmsman's view was unobstructed.

sion.[5] See and compare Compania de Maderas de Caibarien, S.A. v. The Queenston Heights, etc., 5 Cir., 220 F.2d 120; Rice v. United States, 2 Cir., 168 F.2d 219, 220–221; The Mamei, 3 Cir., 152 F.2d 924, 929; Puratich v. United States, 9 Cir., 126 F.2d 914, 916. However this may be, we think it clear from the facts found, as well as those appearing from the record, that the fault of the Gertrude in attempting to execute her requested port to port passing without having received any assenting whistle signal from the Florence, as well as her failure to reduce speed or blow a danger signal until too late to avoid the collision, were statutory faults which require a division of the damages, since her negligence in these respects cannot reasonably be viewed as having played no part in causing the collision. See Title 33 U.S.C.A. § 203; The America, 92 U.S. 432, 438, 23 L.Ed. 724; General Seafoods Corp. v. J. S. Packard Dredging Co., 1 Cir., 120 F.2d 117, 120.

In reaching the above conclusion, we are aware that the district court made no express findings of statutory contributing fault by the Gertrude in this regard, and ordinarily, where the findings are complete and adequate for review, we are reluctant to make additional findings, or to disturb those made by the trial court, particularly where, as here, they are based solely on conflicting oral testimony, rather than on any documentary evidence or testimony by deposition. See C. J. Dick Towing Co. v. The Leo, supra. But here the trial court has found as a fact that the one blast whistle requesting a port to port passing "was the only signal blown by the 'Gertrude'", and that the Gertrude nevertheless *then* failed to blow a danger

signal or stop and reverse engines, in spite of other testimony and findings that "the 'Florence' blew no signals whatever, (and) *did not answer in any way the one blast signal of the 'Gertrude'*." (Emphasis ours.) While it may be argued that the act of the Florence in thereafter momentarily changing her course to her starboard was a maneuver sufficient to signify her acquiescence, we think the Gertrude may not thus completely exonerate herself from blame in view of Maxwell's apparently unwarranted and speculative assumption as to the course and intention of the Florence, at variance with the clear mandate of the rule adopted to avoid confusion in such instances, particularly in view of testimony by Mundine aboard the Florence that he was never even aware of the presence of the Gertrude and her tow "until she was right on me."

Rule I of Article 18 of the Inland Rules, 33 U.S.C.A. § 203 provides that, after a port to port passing is requested, "the other vessel shall answer *promptly*", and Rule III further provides that "if * * * either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt *shall immediately* signify the same" by giving the danger signal. (Emphasis ours.) See James McWilliams Blue Line v. Card Towing Line, 2 Cir., 168 F.2d 720. In this connection, Maxwell's testimony, though equivocal, contains significant admissions that he failed to blow the danger signal or stop, even though he had received no whistle signal from the Florence accepting his proposed port to port passing, and in spite of the fact that he either misinterpreted or did not fully understand the course and intention of the Florence.[6]

---

5. Maxwell testified that he had an unobstructed view forward over the top of the shell on the loaded barge PT–803, and that he could see just as well as a lookout stationed on the bow of that barge, except for objects closer to it than 60 feet. Moreover, there is no direct testimony in this record revealing that Maxwell's failure timely to sight the Florence and her tow had any part in causing or contributing to cause the collision.

6. Maxwell testified in part as follows:
"Q. All right; you were right there when the whistle was blown, and if he

Courts of admiralty have frequently voiced the admonition that there is no right-of-way into a collision, and regardless of any privilege the Gertrude might otherwise have had to maintain her starboard side of the channel had her proposed port to port passing signal been heard and accepted by the Florence, there was a continuing duty on her part to effect a safe passing and avoid a collision. Smith v. Bacon, supra. Under such circumstances, we think it cannot be said with any reasonable degree of assurance that Maxwell's dereliction in this regard, irrespective of the findings of negligence on the part of the Gertrude in failing to maintain a proper lookout, was not at least a contributing cause of the collision, so as to require a division of the damages. The Pennsylvania, 86 U.S. 125, 136, 22 L.Ed. 148; see Tide Water Associated Oil Co. v. The Syosset, 3 Cir., 203 F.2d 264; City of New York v. American Export Lines, 2 Cir., 131 F.2d 902; The San Simeon, 2 Cir., 63 F. 2d 798.

The decree is, therefore,

Affirmed.

had moved any, that would have been close to, would you consider, approximately a half mile, when the signal was blown?

"A. That's right.

"Q. * * You didn't get any answer to that whistle signal, did you?

"A. No, sir.

"* * * * *

"Q. Well, all right; if he did not answer your signal, you would not know whether he wanted you to pass or not, would you, Captain? Don't you always get an agreement to a passing before you try to make one?

"A. Generally, yes, sir.

"Q. Isn't it the rule that if you were in the Channel and you blow a signal, that you are not supposed to alter your helm movement until you do receive an assent from the other side?

"A. Right.

"* * * * *

"Q. Now, Mr. Maxwell, when you did not receive an assent from the other vessel, and you did see he was coming across your course, you were undecided as to just what he was going to do, weren't you?

"A. No, I knew he was the one that was undecided, where he wanted to go.

"Q. Well, weren't you a little undecided? When you say that he started over to your starboard, and then he started back to his port?

"A. When I blew, he started on over to his starboard, which, if we would have went ahead, there wouldn't have been no accident.

"Q. I see; but this course was not definitely known to you, was it? You didn't know what he was going to—

"A. No, I didn't know.

"Q. When he zig-zagged, as we call it—

"A. I sure didn't.

"Q. —you didn't know it, and at that time you were almost half a mile away from him, but you didn't blow the danger signal, did you?

"A. No, sir, I did not."