**BLOOMFIELD STEAMSHIP COMPANY,**
Claimant, Appellant,

v.

**BROWNSVILLE SHRIMP EXCHANGE,**
as owner of the THE LINDA
LEE, Appellee.

No. 16163.

United States Court of Appeals
Fifth Circuit.

May 9, 1957.

870

Robert Eikel, Houston, Tex., for appellant.

M. Harvey Weil, Corpus Christi, Tex., B. G. Wylie, Wm. L. Ellis, Wylie & Ellis, Aransas Pass, Tex., Kleberg, Mobley, Lockett & Weil, Corpus Christi, Tex., for appellee.

Before BORAH, RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

On versions of disparity almost as great as the classic extravagance of collision occurring while both vessels are moving astern through the water, the District Court held the SS Genevieve Peterkin solely at fault for running down the small shrimper MV Linda Lee off the coast of Texas. Seeking a reversal, Genevieve Peterkin contends mightily that she, not Linda Lee, was the innocent one and ought to be exonerated altogether. But as the inevitable anchor to windward, Societa Anonima Navigazione Alta Italia v. Oil Transport Company, 5 Cir., 232 F.2d 422, failing on that she would be content with half a loaf on mutual fault. On damages, she claims too that the award was excessive, perhaps from an erroneous exclusion of some tendered evidence on other "like" sales.

The collision occurred about 9:15 p.m. on a clear, calm, bright night. Genevieve Peterkin, an ocean-going Victory ship, 455 feet in length, in charge of her Fourth Mate, was proceeding at full speed, 15 to 16 knots, on a course True 035. With tenacity for over half an hour and clear through collision she kept plowing ahead with no change of course, speed, signal or alarm. Her mate's explanation was that while instinctively he "could smell" fishing vessels and knew that a myriad of white lights over a wide arc ahead indicated the presence of twenty to fifty such vessels, he disclaimed seeing running or

trawling lights, noticed no movement as he took occasional bearings, and assumed that they were laying to preparatory to daytime fishing. Consequently, since he would not alter his base course merely because fishing vessels were in the vicinity and if he stopped (or slowed down), he would "only last one day on the job" which he had then held but four days, he forged ahead on his original course through the opening in the arc of lights. To this unappealing story was the further substantial ingredient: when the mate finally realized that this was a trawling armada, not vessels at anchor, MV Linda Lee was, he was positive, then proceeding on a substantially opposite course, running approximately southwest. When Linda Lee, on this course, was about three ship lengths ahead and off his starboard a like distance, the fishing vessel suddenly swung sharply to her right and across his course. Responding instantaneously to this imminent peril, he first ordered hard left on the rudder which he countermanded before it was effectually executed because of the danger of throwing his stern into Linda Lee, and, worse, running down fishing vessels admittedly off his port bow at a distance which was actually three to four miles, but which he estimated much closer.

With uncontradicted evidence that while trawling, as they were, with nets out, these shrimpers move at a speed of about one knot, this story destroys itself as utterly impossible. Disregarding exact distances, allowing wide latitude for errors in the estimate of the measurements as such, the Mate's thesis, fixing as he did, Linda Lee at substantially four points, was that both vessels moved the same distance in the same time—a phenomenon which could never happen nor appear to happen even at sea through a sailor's eyes. Three ship lengths—1500 feet—was a minute's run for Genevieve Peterkin, but during the same minute, Linda Lee would scarcely move 100 feet.

But the Judge had much more than this incredible contention for in addition to the master of Linda Lee, he heard oral testimony of the master of the Miss Voncille and Valley Pride, two trawlers flanking her off her starboard quarter at successive distances of approximately three hundred to four hundred yards. All were unanimous that the three vessels were, and had been for some time, trawling with running and trawling lights brightly burning, on a course substantially WNW. The lights of Genevieve Peterkin were seen for about 15 minutes. When Genevieve Peterkin was still about three miles off (12 minutes at her speed of 15 knots), Linda Lee and the other trawlers altered course slightly to the north to a heading of substantially NNW. Genevieve Peterkin kept coming on, and at a time variously estimated at one to two minutes before collision, the master of Linda Lee, sensing quite correctly that Genevieve Peterkin was determined to forge ahead as though they were not there, put his engines on full speed and threw his wheel hard right with the hope, made good, that if the drag of her trawling net made it impossible to get free altogether of the path of the large ship then bearing down, he could at least swing her sufficiently to keep her from being sliced in two by the ship's stem. As it was, the break of the starboard bow of Genevieve Peterkin struck Linda Lee on her port side abreast her pilot house sheering off her bow and shortly sinking her. After striking Linda Lee, and before headway was appreciably checked by the post-collision stopping of her engines, Genevieve Peterkin, still on her original course, scarcely missed by 50 yards collision with Miss Voncille.

■ The Court was, therefore, amply justified in finding Genevieve Peterkin guilty of the most flagrant fault in proceeding through a fishing fleet on the baseless supposition that all were at anchor, and the opening between lights through this arc was a safe fair-

way for unabated speed. She failed to see or heed what was either seen or clearly visible. And when, by her sheer size and speed, she ran through vessels actually engaged in trawling, it was a plain violation of a statutory duty[1] which was only aggravated by the fact that Linda Lee, crossing from off her starboard hand, likewise had that privilege,[2] either or both of which imposed on Genevieve Peterkin the duty, Griffin, Collision (1949), §§ 50, 23, of keeping clear.[3]

■ Seeking to divert attention (and legal consequences) from such palpable neglect, Genevieve Peterkin paradoxically insists that her fault was so great, the impending risk of collision so imminent, that the real blame lay on Linda Lee for not having a lookout better to see how reckless was the navigation of the oncoming ship, and in twice changing course, the last time with change of speed as well. All these she equates as statutory faults to bring them under the protective wing of the The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148. But a dozen lookouts posted fore, aft, and amidships, on deck, in the pilot house, or perched mast high would not have told Linda Lee more than what she already knew: that an ocean-going vessel was coming straight on. Whether the master of Linda Lee ought earlier to have taken evasive action may well have been in the case, but that was a failure properly to interpret the evident facts and had nothing to do with faulty information which other eyes and ears could have seen, heard, judged and reported. A refusal to find inadequate lookout was clearly warranted.[4]

■ Nor were the two changes of course either violations of statutory obligations imposed on the favored, privileged vessel or a real contributing cause of collision.[5] The first, twelve minutes and three miles away from collision, was before risk of it arose, Griffin, on Collision, § 17, and, in any event, could have had no effect on the collision. S. S. Co. The purpose of the rule requiring the privileged vessel to hold course and speed is to enable the burdened vessel to navigate with assurance as to action of the other. The Northfield, 154 U.S. 629, 14 S.Ct. 1184, 24 L.Ed. 680; New York & Liverpool U. S. Mail v. Rumball, 21 How. 372, 384, 62 U.S. 372, 16 L.Ed. 144. Equivocation or vacillation by the privileged vessel leads to uncertainty and increases, not diminishes, risk of collision. But implicit in this is that the burdened vessel senses that the other

---

1. 33 U.S.C.A. § 146j, "All vessels not engaged in fishing shall, when under way, keep out of the way of any vessels fishing with nets or lines or trawls. This section shall not give to any vessel engaged in fishing the right of obstructing a fairway used by vessels other than fishing vessels."

2. 33 U.S.C.A. § 146c, "When two power-driven vessels are crossing, so as to involve risk of collisions, the vessel which has the other on her own starboard side shall keep out of the way of the other."

3. 33 U.S.C.A. § 146f, "Every vessel which is directed by sections 146–146k of this title to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."
   33 U.S.C.A. § 146g, "Every power-driven vessel which is directed by sections 146–146k of this title to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

4. Wilson v. Oil Transport Co., Inc., 5 Cir., 242 F.2d 727; Parker Bros. & Co. v. De Forest, 5 Cir., 221 F.2d 377, 1955 AMC 786; cf. G. B. Zigler Co. v. Barker Barge Line, 5 Cir., 167 F.2d 676, 1948 AMC 2059; Smith v. Bacon, 5 Cir., 194 F.2d 203, 1952 AMC 297, modified on rehearing, 5 Cir., 196 F.2d 912, 913, 1952 AMC 1343.

5. 33 U.S.C.A. § 146e, "Where by any of sections 146–146k of this title one of two vessels is to keep out of the way, the other shall keep her course and speed. When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision (see sections 146k and 147a of this title)."

is privileged and then, in *reliance*, on that and the expectation that the other will hold course and speed, adapts her navigation to the rules. Here, Genevieve Peterkin not only did not rely on the status of Linda Lee as a fishing vessel then trawling or a crossing vessel, she does not even claim that the change in course was either noticed as a fact or gave rise to any uncertainty. Indeed, the Mate's supposition was that all were stationary, not moving. And, once the story of a sudden 90 degree swing to the starboard by Linda Lee from a course SW to W or NW is rejected as incredible, the first change of course (WNW to NW or NNW) even if it had been noticed by Genevieve Peterkin, did not change their status, or mislead her and actually lessened risk of collision since it was broadening, not decreasing, the space between the two.

As far as the second, it was the act in extremis, whether permissible or required, as Linda Lee realized that Genevieve Peterkin was perversely coming on and would not, or could not, then avoid collision by belatedly complying with her duty, Wilson v. Pacific Mail SS Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651, 1928 AMC 740; The Britannia, 153 U.S. 130, 14 S.Ct. 795, 38 L.Ed. 660; The Delaware, 161 U.S. 459, 468, 469, 16 S.Ct. 516, 40 L.Ed. 771. And here again, the maneuver, attempting to swing away from the oncoming ship at least afforded a possibility that the likelihood of impact would be decreased and, equally important, would minimize the risk of loss of life to other crew members were the trawler cut in two by the ship's stem bar.

The conclusion of sole fault, if not compelled, was at least warranted and it and the subsidiary findings easily pass muster under the concept of "clearly erroneous." McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, 1954 AMC 1999; Ionion Steamship Company of Athens v. United Distillers of America, 5 Cir., 236 F.2d 78, 1956

AMC 1750; Mississippi Valley Barge Line Co. v. Indian Towing Company, 5 Cir., 232 F.2d 750, 1956 AMC 757.

■ On damages, the Court fixed the value of the Linda Lee and her fishing gear at $30,000. Genevieve Peterkin apparently thinks that since it was bought after a fire several years earlier for $6,000 and its book value on the accounting records of her owner was $23,500, the award had to be limited to this, or to a similar amount fixed by Genevieve Peterkin's surveyor testifying as an expert. As is so often the case, neither party, by pointing to actual recent sales of similar vessels, could fix a market comparable to that found for commodities or things moving with greater frequency. Consequently, all of the factors discussed in The Fire Island, 5 Cir., 180 F.2d 962, 1950 AMC 873; Standard Oil Company of New Jersey, v. Southern Pacific Company, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890, 1925 AMC 779, became relevant. Testimony from the owner of Linda Lee established actual costs in refitting the vessel at around $27,000. Testimony from this owner, whose ownership and operation of some twenty-five American and Mexican shrimping vessels would obviously clothe him with some judgment of the value of the principal tool of the trade, fixed a value in the neighborhood of $35,000. That of another operator of a large fleet having general knowledge of such operations and comparing her value to the sale of two other specified vessels fixed it at $30,000 to $32,000. That of a shipyard operator, familiar with cost of construction, maintenance and repair, and consulted occasionally on general valuation of such vessels, set her value at $39,000 to $41,000. This was quite adequate to enable the Judge to make the informed judgment of its probable actual value. All of these witnesses, as was Genevieve Peterkin's surveyor, were subjected to critical cross examination which fully explored the endless variables, not only in build, size, charac-

teristics, but state of upkeep, history or operation, exposure and damage, by which men of business arrive, as they do countless times, at a dollar value at which they would consider it prudent judgment to buy or sell even though there is not, in the traditional sense, a demonstrable market in which like or comparable things are regularly sold and traded in with frequency.

 The decision of the Judge that the proffered authenticated copies from United States Customs House records of the sale of fishing vessels during the past year was not admissible was neither error nor harmful error, 28 U.S.C.A. § 2111. The Court did not reach the question whether they were admissible as business or Governmental records under 28 U.S.C.A. §§ 1732, 1733. Nor do we. For we agree with the District Court that while actual sales are relevant, and these or similar papers with *more* would perhaps be relevant and probative, standing alone as they did on the proffer, they were simply inadequate to show anything with reliability. They were, first, only those in which an actual consideration was stated in dollars. But interspersed in the chronology of the records were numerous sales for nominal considerations. If the former were "comparable," why were not these? And how was the Judge to weigh the latter? Next, those offered with a stated consideration, showed that the actual sales price ran the gamut of $11,000, $16,000, $16,500, $18,000, $20,000, $23,000, $26,500, $31,-000, $40,000. If they were, as the proffer had to imply, sales of comparable vessels, how could this disparity of $29,-000 be accounted for or weighed? Obviously, this reflected what all experts acknowledged, that value depends on many things, only a bare few of which were even remotely indicated on this Governmental record kept for quite a different purpose.

The Judge exercising the function that is his, not ours, Bisso, Jr. v. Waterways Transportation Co., 5 Cir.,

235 F.2d 741, weighed disputed evidence on liability and damages and came to conclusions which are plausible and certainly invulnerable to an attack as clearly erroneous. There the matter ends.

Affirmed.