AMERICAN CYANAMID COMPANY; A/S A. O. Anderson & Co., Owner and Operator of M/V BEREAN; United States of America and Lucy Duncan, Appellants,

v.

CHINA UNION LINES, LTD., as Owner of the S.S. UNION RELIANCE, Appellee.

CHINA UNION LINES, LTD., as Owner of the S.S. Union Reliance, Appellant,

v.

AMERICAN CYANAMID COMPANY, A/S A. O. Anderson & Co., Owner and Operator of M/V Berean; United States of America and Lucy Duncan, Appellees.

No. 19617.

United States Court of Appeals Fifth Circuit.

Aug. 1, 1962.

James E. Ross, J. Donald Stillwell, Houston, Tex., Bryan F. Williams, Jr., Galveston, Tex., Jack Shepherd, Asst. U. S. Atty., Houston, Tex., Donald M. Waesche, Jr., New York City, John W. Boult and Morton Hollander, Attys., Dept. of Justice, Washington, D. C., for the United States.

Platow & Lyon, New York City, Eastham, Watson, Dale & Forney, Houston, Tex., Robert Eikel, Houston, Tex., Edward F. Platow, New York City, Edward W. Watson, Galveston, Tex., of counsel, for China Union Lines, Ltd.

Newton M. Crain, Jr., Newton B. Schwartz, E. V. Greenwood, Joseph Newton, Houston, Tex., Preston Shirley, Galveston, Tex., Frank G. Harmon, Houston, Tex., for interested parties.

Before CAMERON, WISDOM and GEWIN, Circuit Judges.

CAMERON, Circuit Judge.

This complicated admiralty case is before us on interlocutory appeal pursuant to leave granted by this Court April 11, 1962. Eleven briefs are filed in behalf of seven parties: the United States, China Union Lines, Ltd., American Cyanamid Company, Lucy Duncan, Ben G. Sewell, Trustee, Mitsubishi International Corporation, Shinko Sangyo Trading, Ltd., and other owners of parcels of cargo aboard M/V Union Reliance and A/S A. O. Anderson & Co., owner and operator of M/V Berean. Other parties or prospective parties participated through their proctors in the hearings reported in the record.

We will adopt in the main, and with some omissions and additions, the State-

ment of the Case made in the brief of the United States as setting forth the salient "facts" sought to be presented to us:

On November 7, 1961 the M/V Union Reliance, owned and operated by China Union Lines, Ltd., a corporation organized under the laws of the Republic of China, collided with the M/V Berean, a Norwegian tank vessel. The collision occurred at night during clear weather in that portion of the Houston Ship Channel which passes through Galveston Bay. The Union Reliance, while departing from the Port of Houston, Texas, under the direction of a licensed pilot, was proceeding down the Houston Ship Channel when those aboard observed the lights of the inbound M/V Berean. As the Union Reliance approached the Berean she sounded a single blast on her whistle indicating a desire to pass port to port. However, shortly thereafter the Union Reliance failed to answer her wheel and she continued to swing to port across the channel. As a result, the bow of the Union Reliance collided with the port side of the Berean. The Berean was laden with highly volatile cargo which caught fire and spread to the foredeck and forward cargo holds of the Union Reliance. In addition to extensive hull and cargo damage to both vessels, twelve persons, including Pilot Duncan, lost their lives aboard the Union Reliance. After the collision the Union Reliance was left deserted by its owners in the heavily trafficked artificial channel, the Houston Ship Channel. As the improver and maintainer of this channel, the United States, pursuant to 33 U.S.C.A. § 415, removed the wreck, a service for which the owners refused payment, and which constitutes the basis of the claim filed by the United States against the limitations fund established by the subsequent sale of the remnants of the Union Reliance. Previously, a libel based on this claim had been instituted against China Union Lines by the United States in the United States District Court for the Southern District of Texas. This action, Admiralty No. 2012, was enjoined by order of the district court when China Union Lines filed its petition for limitation of liability.)

On November 28, 1961 China Union Lines filed a Petition for Exoneration from or Limitation of Liability pursuant to the Limitation of Liability Act, 46 U.S.C.A. § 181 et seq., praying, *inter alia,* for transfer of its interest in the Union Reliance and pending freight to a court-appointed trustee for the benefit of claimants, and for an order directing the discharge of all cargo remaining aboard the vessel.

On November 29, 1961, the district court entered an order directing the transfer of the Union Reliance to a trustee for the benefit of claimants. On that date the vessel was accordingly transferred to the trustee by Robert Eikel acting as Agent and Attorney-in-fact for China Union Lines. Also on November 29, 1961, the district court entered an order citing all claimants in the limitations proceeding to appear on or before March 5, 1961, and restraining the prosecution elsewhere of all claims arising from the collision. Finally, also on November 29, 1961, the district court entered an order entitled "Order to Unload Cargo from SS Union Reliance." This order, prepared by counsel for China Union Lines, stated in part:

" * * * The vessel is now moored in Galveston Harbor in a condition requiring the taking of immediate steps to salve, preserve and deliver to the rightful owners the cargo now remaining on board the vessel, and that substantial expenditures have heretofore been made by the petitioner in an endeavor to salve the cargo. * * * "

Thus, the court ordered that the cargo be discharged, and that China Union Lines be reimbursed out of the proceeds of the sale of the vessel for expenses incurred by it in unloading and handling the cargo. The court, on December 20, 1961, verbally added $20,000.00 to be disbursed to China Union under the same terms as the initial $40,000.00.

Pursuant to the district court's order of sale, dated January 3, 1962, the vessel was sold by the trustee on January 12, 1962 for scrap for a purchase price of $109,100.00. The sale was confirmed by order of the district court on January 12, 1962.

Subsequently, China Union Lines filed a Motion for Disbursement of Funds requesting a disbursement to it of $90,000.-00 from the proceeds of sale as reimbursement for expenses incurred by it in salving and unloading the cargo from the vessel. On March 12, 1962 the district court entered its Order on Petitioner's Motion for Disbursement of Funds, authorizing therein the disbursement to China Union Lines of $60,000.00 for expenses incurred by it to salve, preserve and protect the Union Reliance and her cargo. The district court entered an amendment to the order staying the disbursement of funds pending application by interested parties to this Court pursuant to the provisions of 28 U.S.C. § 1292 (b).

On April 11, 1962, this Court, under the provisions of 28 U.S.C. § 1292(b), granted permission to appeal from the interlocutory order of the district court authorizing the above-mentioned disbursement of funds.

The libel of the United States claimed a sum in excess of thirty thousand dollars for its services in connection with the handling and removal of the Union Reliance from the traffic lanes. The pro-

ceeding brought November 28, 1961 for exoneration and limitation by China Union Lines bears the number 2018 on the records of the court below. On April 26, 1962, the United States filed in each case a motion to dismiss the injunction which had been issued upon the surrender of the China Union to the trustee. The motions were based on the ground that the petition of China Union had been verified only by the local proctor, that the proctor had not complied with the order of March 16th directing him to produce, within thirty days from the date thereof, a certified copy of the corporate resolution or other document issued under the laws of the Republic of China authorizing the surrender of the vessel to the trustee, and showing authorization to the proctor to act on behalf of China Union Lines. The district court did not pass on these motions.

The trial court did not hear any evidence as that term is generally used, but had three extensive conferences with the proctors representing the several parties. Transcripts of what transpired at those conferences are before us. All of the parties chiefly interested were represented except that Mrs. Lucy Duncan was justifiably absent from the first two and no proctor was present representing the estates of any of the others killed in the collision or any party claiming personal injuries. The conference of November 29th was followed by the entry of the order of that date, pertinent parts of which are reproduced in the margin.[1]

1. The order entered by the court below on November 29, 1961 bearing the heading: "Order to Unload Cargo from SS Union Reliance," reads in part:
"Petitioner herein, China Union Lines, Ltd., having duly filed its petition for exoneration from or limitation of liability and in connection therewith having in compliance with the order of this Court fully transferred all its interest in the said vessel, the SS UNION RELIANCE, and its pending freights, and claims against others, and on hearing it appearing that the said vessel is now moored in Galveston harbor in a condition requiring the taking of immediate steps to salve, preserve, and deliver to the rightful own-

ers the cargo now remaining aboard the vessel, and that substantial expenditures have heretofore been made by petitioner in an endeavor to salve the cargo and to preserve whatever value the vessel may have for its own and claimants' benefit, and that it is necessary that additional substantial expenditures be made to preserve the said cargo and the remaining value of the vessel for those who may be entitled to such values, and to such cargo,
"NOW, THEREFORE, IT IS HEREBY ORDERED that J. R. Bencal be, and he hereby is, appointed salvage master, to take such measures as may be in his judgment reasonably necessary to un-

The second meeting of the court and proctors was held December 20, 1961 in the judge's chambers with substantially the same parties represented by their proctors. It appeared from statements of the clerk of court that by then a half dozen actions had been begun in connection with the collision. The court announced that the conference had been called at the instance of the trustee and the proctors for China Union and its underwriters chiefly to discuss the duties and authority of the trustee, the court stating: "Mr. Eikel [China Union's proctor] was of the view that Mr. Sewell's [the trustee] position, I think, was one more or less as a figure-head, and that he, Mr. Eikel, on behalf of the original owner, would look after these various matters that needed attention, and so

load the remaining cargo aboard the said vessel and to preserve the said vessel pending a further order for sale thereof hereafter to be made, such actions of J. R. Bencal to be taken after consultation with R. L. Wynne, surveyor for the general average adjustors heretofore appointed by certain persons interested herein, * * *

"ORDERED that upon being unloaded the cargo shall be delivered into warehouses into the possession of the said R. L. Wynne, and thereafter be held or disposed of under his supervision and sole responsibility * * * including delivery of cargo to the rightful owners upon giving of the customary bonds, and the sale on the best terms available by public or private sale of the cargo unclaimed within a reasonable time * * *

"ORDERED that immediately upon the completion of unloading of said cargo, the said J. R. Bencal shall notify this Court of the completion of this phase of his duties, so that a further order may be entered directing the trustee to sell the vessel forthwith and to deposit in the registry of this Court the proceeds of such sale, to await further orders of the Court; and it is further

"ORDERED that petitioner may expend sums not to exceed $40,000.00 as may be required to unload the said cargo and to preserve the vessel pending sale, and to deliver the said cargo into the custody of the said R. L. Wynne, and to pay the costs of the handling of the said cargo by the said R. L. Wynne and under his supervision * * *; and such sums shall be reimbursed to petitioner from the proceeds of the sale of the vessel and from payments made to R. L. Wynne in the nature of general average payments made by and on account of cargo in accordance with the rules and practices of general average, without prejudice to the right of any interested party to proceed against such cargo, and in accordance with further orders of this Court, it being the intent of this order that the sums so expended under this order by the petitioner shall be reimbursed to it with priority over other claims immediately out of the proceeds of the sale of the vessel; but that thereafter in accordance with the practices of general adjustments and the final determination of this cause, an accounting shall be made and such final account insofar as these sums advanced by petitioner is concerned shall finally determine and fix the liability for such expenditures and reimbursement therefor against the proper party or parties, such present advancement being without prejudice to petitioner's rights * * *; and it is further

"ORDERED, that petitioner and claimants herein shall have the right to conduct at reasonable times, each at its own expense, joint surveys of said vessel * * *; it is further

"ORDERED, that should it appear that the costs of handling of vessel and cargo as set forth herein above are likely to exceed the sum of $40,000.00, that application may be made by petitioner to expend further sums over and above $40,000.00 and that it be reimbursed for such sums as costs of court herein in the same manner stated above herein as to priority on further order as soon as it may conveniently be done on sale of the said vessel and deposit into the registry of the Court of the proceeds of such sale; and it is further

"ORDERED, that application may be hereafter made at any time for payment out of the proceeds from the sale of the vessel of any sums expended between the date of the disaster of November 7, 1961, and the date of this order which was made for the purpose of clearing the navigable waters of the damaged vessel and her cargo and to salve and preserve the vessel and her cargo, including the claims made by the United States in Cause A.D. No. 2012 upon the docket of this Court, all parties hereto including petitioner and claimants being then accorded the right to contest the propriety and priority of any such claims for such expenditures * * * *"

forth, and I wanted the advice and thoughts of you gentlemen before we proceed further in the matter * * *." Ideas were swapped at length and it was apparent that the dozen proctors present were bent upon upholding the rights of their respective clients. At one time, the court said in effect that he doubted if the proctors "could agree that today is Wednesday." The tangible thing emanating from this conference was the announcement by the court that the additional twenty thousand dollars paid out by China Union would be given the same treatment as the forty thousand dealt with in the order of November 29th.

A like all-day meeting held by the court below and interested proctors on February 13, 1962 was opened by the court's statement: "A number of counsel have called and asked that I set down for informal hearing the matter of the disbursement of certain funds which are the proceeds of the sale of the vessel [Union Reliance]. It had been sold for scrap, after unloading had been completed, for the sum of $109,100.00, which was in the registry of the court. The trustee was called upon and he advised that the chief item to be taken up was a motion filed by the owners of the China Union praying that about ninety thousand dollars be disbursed to the ship owners, representing about seventy-five thousand dollars claimed by them to have been paid out and substantially thirty-five thousand of unpaid bills which were being pressed for payment. The arguments which ensued between the various proctors occupies nearly two hundred pages of the transscript before us. The order from which the appeals were taken was entered March 12, 1962 and is, in its pertinent parts, set out in the margin.[2]

2. The order entered by the court below on March 12, 1962, headed: "Order on Petitioner's Motion for Disbursement of Funds," reads in part as follows:

"On the 13th day of February, 1962, having come on to be heard the motion of petitioner, China Union Lines, Ltd., for disbursement of funds received from the sale of the remnants of the vessel M/V UNION RELIANCE, and after hearing argument of counsel, it appeared to the Court substantially as follows:

"That under the Order of November 29, 1961, and subsequent Order entered orally in open court on the 20th day of December, 1961, which Orders authorized the expenditure by petitioner herein, China Union Lines, Ltd., of the sum of Sixty Thousand Dollars for salvage and care of the wreck of the UNION RELIANCE and her cargo, said petitioner has expended sums which it contends were in conformity with, and authorized by, said Orders, in the amount of approximately Seventy-three Thousand Dollars; and that there are outstanding other obligations incurred by petitioner of a similar nature which it similarly contends were in conformity with, and authorized by, said Orders, in the amount of approximately Fifty Thousand Dollars; that there is much dispute with other parties at interest herein concerning the propriety of the disbursement of such funds by the petitioner, it being contended by others at interest herein that certain of such expenditures were excessive, inordinate, unreasonable and unnecessary; that others at interest herein also contend that the Orders herein above referred to were improper in any event as unwarranted invasion of the fund resulting from the sale of the UNION RELIANCE, which, it is contended, should be held for the benefit of claimants; it being further contended that in no event should petitioner be entitled to reimbursement for an amount in excess of Sixty Thousand Dollars, as specifically provided in said Orders.

"The Court being of the view, however, that the obligations presently outstanding, in the sum of some Fifty Thousand Dollars, should, in justice, be paid, in that same were incurred for the purpose of protecting, safeguarding and for the salvage of, the vessel and cargo, and the Court being of the further view that there is no substantial dispute but that petitioner is entitled to reimbursement of a substantial amount, despite the contentions of adverse parties to the contrary, IT IS THEREFORE ORDERED that the Clerk shall, out of the proceeds in the Registry of the Court, pay to petitioner, through its Proctor of record, Robert Eikel, Esq., the sum of Sixty Thousand Dollars in the manner and upon the terms and conditions as hereinafter set out * * *

[The following three paragraphs authorize the clerk to issue checks upon the funds of the registry of the court upon certificate of the proctor for China

It is clear from the above that the judicial actions of the court below, culminating in its order of March 12th from which the appeals before us were taken, were based upon the discussions between the court and the proctors for the several parties which, when transcribed, occupied substantially three hundred pages of the record. Since the discussions took place on three separate days over a period of something more than three months, it is natural that a great deal of what was said represents repetition.

The contest which is depicted in the transcript of these hearings is based upon the claim (backed for the most part by the owners of the China Union and of its cargo and by Sewell, the trustee) for substantially $100,000.00 of the $109,-000.00 paid into the registry of the court by the purchaser of the China Union; and contested by the Government, backed by the owners of the Berean and of its cargo and representatives of the employees of China Union who were injured and killed in the collision. The former group will be referred to as petitioners,

and the latter as respondents. An effort, abbreviated as severely as the three hundred pages of oral argument and eleven briefs will permit, will be made to outline the respective positions relied upon by them.

In general, petitioners rely upon the wording of the order of November 29th, supplemented by that of December 20th, and substantially confirmed in principle by the order of March 12th. They stress also the intrinsic justice and equity in their claim. They insist that China Union performed its full duty when it surrendered its ship as of the time of the collision November 7th, along with freight payments due it and whatever claim it had against Berean based upon the collision; and that the owners had no duty to seek to protect or salvage her, or to put out the fire, or to transport her to the dock in Galveston, to take the cargo ashore, or to transport it for delivery to the owners. They take the position that all of these services were performed, not only under orders of the court with specific promise of reimburse-

Union that the obligations were incurred for the purposes embraced in the preceding order, and that the portion of the $60,000.00 not paid out in connection with outstanding bills shall be paid to China Union.]

"It being the contention of petitioner that it is entitled to the return from the proceeds of the sale of the vessel and her freight of a larger amount than the Sixty Thousand Dollars herein provided, the certificate of petitioner's Proctor * * * shall be without prejudice to the further assertion of the contention that petitioner is entitled to prompt return of such additional amounts.

"It being the contention of claimants herein that petitioner is entitled to no reimbursement, or, alternatively, to reimbursement in an amount substantially less than the Sixty Thousand Dollars for which provision herein is made, IT IS FURTHER ORDERED that in the event it be hereafter determined by this Court, upon ultimate determination of this matter, that the sums paid hereunder exceed the amount of reimbursement to which petitioner may be entitled, said petitioner shall forthwith re-deposit with the Clerk such excess.

"All of the disbursements made and to be made hereunder shall be without prejudice to the rights of petitioner and all other parties to this proceeding to the ultimate determination of the merits of this controversy and of the liability for such expenditures, and to the right of petitioner to priority in payment from the proceeds in the Registry of the Court and without prejudice to the right of the United States to move for payment upon hearing and proper proof of the amounts due it for clearance of the navigable waterway of the United States for which relief is sought in Admiralty No. 2012.

"The clerk is directed to withhold the release of any funds as herein provided for a period of ten days from and after the date of entry of this Order giving notice of appeal, should any party desire to appeal from this Order. In the event an appeal is properly commenced within such period and expeditiously prosecuted, then the release of any funds as provided for herein shall be stayed pending disposition of said appeal, but in the absence of notice of appeal within such ten-day period, the Clerk is directed to release such funds, as is provided herein."

ment, but that every step they took was for the benefit of the claimants against the ship; that money for its preservation had necessarily to be obtained from some source; and that the money, if borrowed, would have to be secured by the ship and interest paid thereon. They argue that the respondents are in as good position as if this money had been obtained under these circumstances from an outsider, and that what China Union has done has been performed for the benefit of respondents, and that respondents, at least tacitly, agreed to all of the steps taken and to the reimbursement claimed by China Union.[3]

Respondents claim, in general, that China Union was under the contractual and legal duty to take hold of the damaged vessel, transfer it to port, and to make delivery of the cargo valued at something like $750,000.00; that what China Union did was done largely in the performance of this duty; and that no showing at all was made of the portion of the disbursements attributable to the transportation of the ship. They argue that, under the terms of the limitation statute, it was the duty of China Union to leave the entire fund arising from the sale in the registry of the court undepleted by any of the actions taken by China Union as revealed in the arguments made in this case. It is contended that, although China Union surrendered its vessel, the orders of the court really permitted it to continue its voyage to destination and to discharge and deliver its cargo; that its proctor retained control of the vessel, and expended nearly all of the monies delivering cargo and none of consequence performing any duty it was not already required to perform. They deny that they agreed to

the expenditures, the Berean contending especially that it objected throughout, and Lucy Duncan claiming that she had no notice of the proceedings and that she, and presumably the others injured and killed, were left out of the proceedings until those leading to the order of March 12th. And whether any of the parties are impaled upon such nebulous doctrines as laches and equitable estoppel is the subject of strenuous argument.

It is not necessary that we attempt to answer these questions so ably and earnestly presented by the proctors for the various parties. It is sufficient to say that even if the partisan statements of counsel making their arguments to the court should be construed as evidence, there is no showing by which this Court or any other could determine how much the China Union expended in transporting the ship to the dock where the owners of the cargo could remove it if they so desired and where the ship could be easily boarded and examined by prospective bidders.

■ But we need not reach this question, because, in our opinion, the record does not present a case which is ripe for appellate decision. While it is accepted jurisprudence that admiralty practice is liberal rather than technical with regard to admissibility of evidence, and that admiralty courts are not bound by common law or statutory rules of evidence; no one has suggested that an admiralty court may enter a judgment which is not supported by any evidence at all or by evidence which is not based upon the knowledge of the witnesses who give it. Cf. 2 Am.Jur.2d, Admiralty, § 208, page 844, and cases cited; and 1 Am.Jur., Admiralty, § 110, page 604.

3. The brief for some owners of cargo aboard the Union Reliance states:

"We, as counsel for certain cargo interests on the Union Reliance, have insisted from the date of the collision that petitioner China Union perform its legal obligations to the cargo by discharging same and arranging for forwarding and/or delivery to its owners * * * While we felt that China Union was un-

der an obligation to advance funds to implement and conclude the general average that it had declared, we had been advised that no fresh money of any substance was available to counsel for China Union to assist in this purpose."

As far as we can find, no challenge of the foregoing statement has ever been made by China Union.

■ Moreover, the court below failed to find the facts and state its conclusions of law, as required by Admiralty Rule 46½, 28 U.S.C.A.; and see 2 Am.Jur.2d, Admiralty, § 218, page 849; and cf. Victory Towing Co., Inc. v. Bordelon, 5 Cir., 1955, 219 F.2d 540, and authorities cited. The facts are in sharp dispute and there is little agreement between proctors as to the controlling principles of law. Under any circumstances, therefore, orderly procedure would require that the trial court discover and set down its findings and conclusions so that we could, as an appellate court, test their accuracy and binding force.

■ But a careful reading of the record of what transpired in the court below leaves us unconvinced that this is a case which presents a "controlling question of law" whose decision "may materially advance the ultimate termination of the litigation." 28 U.S.C.A. § 1292(b). Certainly no ruling by the court, no conclusion of law tend to frame such a question. If, in the total absence of evidence, we turn to speculation based upon the arguments of the proctors, we still find no such question of law presented.

When China Union turned its ship over to the court's trustee and the transaction was confirmed by the court's order, nobody questions that China Union could have washed its hands of the whole affair with assurance that it would have full protection of such exoneration or limitation as the facts would afford it. The duty would have thereby been shifted to the court's trustee to protect and preserve the ship. But China Union did not do that. It approached the court offering to put up the money which the trustee was under duty to provide. It had no interest not common to all in looking after the preservation of the wrecked Union Reliance, which it had turned over to the trustee.

But, as stated, it initiated and pressed upon the court at every stage of the subsequent proceedings as covered by the record, the idea that it would in effect advance the money necessary to transport the floundering vessel to safe harbor. What it accomplished by so doing was mainly two things: (1) it preserved the ship and made it more easily available to prospective purchasers. If nothing more than the expense entailed by that procedure were here involved, it is possible that no controversy would have arisen as to reimbursement to the owner of the money advanced for that purpose when and if competent proof should be made of the reasonable amount required. No such proof was made, but it is clear that such a simple operation would have involved only a fraction of what China Union now claims from the fund created by the ship's sale.

(2) China Union's diligent efforts also rescued the vessel from the hazards attendant upon its possible capsizing or total destruction by fire, so that cargo worth seven to ten times the value of the salvaged hull of the ship was made available to cargo owners. From the statements of the proctors in the several informal conferences and repeated in the briefs, it is clear that the underwriters of this cargo had, therefore, a much larger stake than the owners of the ship in bringing her to port and removing the cargo remaining aboard.

The record before us and before the district court fails to shed any light on the crucial question of what transpired between the owners of Union Reliance and the owners of her cargo (following cargo's demands, footnote 3 supra) in connection with this assumption and performance by the ship owner of duties which, under the circumstances apparently present here, would have been performed entirely by the trustee to whom the court had ordered the ship transferred. It is essential, in our opinion, that all of the facts be developed before the district court so that it can, with assurance, find the facts which were, at such times, known or available to the owner of the ship and to the underwriters of the cargo, as well as the negotiations, if any, between them which led up to the handling of the ship and the cargo by or under the direction of the China

Union after it was surrendered to the trustee. Only by such a hearing can an informed conclusion be reached as to whether the situation as it developed was articulate, or whether, as some of the parties contend, the virtual consumption of the limitation fund by legitimate salvage operations became apparent only from the viewpoint of hindsight.

The asserted controlling importance of the sole question involved in this appeal—i. e., the depletion, almost to the vanishing point, of the limitation fund by the salvage expense—tends to disappear in the light of some of the argument made by China Union itself. In its third and final brief filed before us, it relegated this point to a position of negligible importance in its discussion of the claims outstanding against the limitation fund for personal injuries to and deaths of the members of China Union's crew.[4]

The multiple claims aggregating an amount reaching into the millions and involving complicated questions of law and fact supplement the foregoing considerations in leading to the compelling conclusion that this record did not, at the time of the certificate of the district court or of our order permitting the appeal, and does not now present a situation which ought to be dealt with under the Interlocutory Decisions Act, 28 U.S.C.A. § 1292(b). The record reflects that progress has been made in the taking of depositions, and doubtless proceedings have continued in the district court and it is nearer the point where it may dispose of the questions which have been placed before us, all embracing orders which

are interlocutory and, therefore, still within the bosom of the court and subject to change, cf. Dyal v. Union Bag, etc. Corp., 5 Cir., 1959, 263 F.2d 387, 394, along with the other questions before it.

The order of this Court of April 11, 1962 permitting interlocutory appeal is, therefore, vacated and the case is remanded to the district court for further proceedings not inconsistent with this opinion.

Vacated and remanded.

---

4. This quotation is taken from the brief mentioned:

"This provision of the code [46 U.S. C.A. § 183] provides in no uncertain language that a petitioner cannot secure limitation of its liability until it makes up for those suffering injuries or death a fund equal to a vessel value of $60 per gross ton.

"The M/V UNION RELIANCE * * * was approximately 7,000 tons * * * the petitioner therefore is compelled if it is to be accorded limitation of liability to make sure that the fund here aggregates at the time of the final decree

no less than $420,000 for death and personal injury claims, if necessary adding to the fund such additional amounts to make up this figure.

"How can in reason and probability the estate of Lucy Duncan therefore be prejudiced by deducting from $109,000 the salvage expenses?"

The answer to that question may well be found in several of the representations made during argument by the petitioner's proctor concerning the difficulty it was having raising money for the salvage operations.