417 F.2d 1274
 EAST-WEST TOWING COMPANY and Alamo Water Transportation Company, Libelants-Appellees,
v.
NATIONAL MARINE SERVICE, INC., and the M/V MIDWEST CITIES, her engines, etc., Respondents-Appellants.
TENNECO OIL COMPANY, Libelant-Appellee,
v.
NATIONAL MARINE SERVICE, INC., and the M/V MIDWEST CITIES, her engines, etc., Respondents-Appellants.
 No. 27434.
 United States Court of Appeals Fifth Circuit.
 November 12, 1969.
 
 Joseph Newton, Houston, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel, for appellants.
 James E. Ross, Houston, Tex., Blades, Crain, Slator, Winters & Ross, Houston, Tex., of counsel, for appellee.
 Before GEWIN, THORNBERRY and AINSWORTH, Circuit Judges.
 PER CURIAM:
 
 
 1
 This case arises from a collision on the Mississippi River involving the tug Midwest Cities, owned by National Marine Service, Inc. (National), and the tug Cecelia R. As a result of this collision the tank barge Alamo 700, a part of the Cecelia R's tow, suffered physical damage and the loss of a part of its cargo. East-West Towing Company and Alamo Water Transportation Company, owners and operators of the Cecelia R and her tow filed suit against the Midwest Cities and National in the United States District Court for the Southern District of Texas. Tenneco Oil Company, owners of the Alamo 700's cargo filed a separate action against the same respondents. The cases were consolidated and tried by the court without a jury. National appeals from an adverse judgment by the district court contending that the court's findings that the collision was caused by the negligence of the Midwest Cities and that the Cecelia R was free from fault are clearly erroneous. National also alleges that the district court erred in the admission of certain evidence on the question of damages, and in its failure to indulge a presumption against the Cecelia R for failing to call certain witnesses. We affirm.
 
 
 2
 On the evening of February 21, 1966, the Cecelia R set out from the Tenneco dock on the east bank of the Mississippi River approximately 1 mile upstream from the Algiers Lock which is located in a canal off the west bank of the river. Three tank barges, including the Alamo 700, loaded with premium gasoline, were made up in a line to the bow of the tug. The Cecelia R intended to enter the intercoastal canal through the Algiers lock.
 
 
 3
 The Mississippi was at a high stage and the current was exceptionally strong. On leaving the dock, the Cecelia R was headed upstream and proceeded toward the lock by allowing the current to carry her down river while running her engines slow ahead. She stayed parallel to the river bank and closer to the east side of the river than to the west side, where the Algiers lock was located. When the Cecelia R neared the area of the lock, she contacted the lock operator by radio-telephone and was informed that the Midwest Cities, pushing two loaded tank barges, was coming out of the lock bound upstream.
 
 
 4
 According to the testimony of the captain and deckhand of the Midwest Cities, their vessel encountered a considerable amount of driftwood in the forebay of the lock because of the high stage of the river; and as they moved out into the river, large amounts of this driftwood hung under and around their tow and onto the side of the boat. The Midwest Cities proceeded out into the current and almost made her point upriver. In this procedure the captain was endeavoring to align the barges and the tug with the axis of the river. He testified that he was unable to maintain this point and proceed upriver because of the driftwood he had carried out of the forebay. When it became obvious that the Midwest Cities could not make headway upriver, the captain reversed his engines and proceeded full astern in an attempt to realign his barges properly.
 
 
 5
 The testimony is in conflict as to the type of signals which were given by the Midwest Cities. Her captain and the deckhand testified that when the engines were reversed, they sounded a signal of three short blasts, indicating full astern, and when they drew near the Cecelia R sounded a danger signal of four short blasts. The captain of the Cecelia R testified that he heard only one series of four or more blasts immediately before the collision.
 
 
 6
 The captain of the Cecelia R testified that he observed the progress of the Midwest Cities both visually and on radar. He stated that he observed the tug fall off its point on his radar and when she drew close to his vessel he proceeded full astern, sounding the appropriate signal, in an effort to avoid a collision. The maneuverability of the Cecelia R was limited because of the presence of a dredge located between her position and the east bank of the river. Before the collision the Cecelia R also sounded a four blast collision warning.
 
 
 7
 As the tugs passed on the river the lead barge of the Midwest Cities' tow scraped the lead barge of the Cecelia R's tow causing a leak and the loss of a part of its cargo.
 
 
 8
 The district court found that the Midwest Cities was solely responsible for the collision. He rejected the claim that her failure to gain her point was caused by the driftwood, and found that the situation was caused by the tug having insufficient power to maintain her position in the swift current and the negligence of her captain in failing to anticipate the condition of the river. The radio-telephone on board the Midwest Cities was out of order and the court found this failure to have proper equipment to notify the Cecelia R of the circumstances also amounted to negligence. These findings of fact may not be disturbed unless clearly erroneous. McAllister v. United States;[1] Rule 52(a) Fed.R.Civ.P.
 
 
 9
 In an effort to bolster its allegations of error in the factual conclusions of the court, National seeks to establish an absolute duty on the part of a tug in navigation to maintain an independent lookout on board the lead barge of her tow. Such an extreme position is not supported by the decisions of this circuit. In Parker Bros. & Co. v. DeForest,[2] this court stated:
 
 
 10
 * * * [A] separate and independent lookout aboard a tug or the lead barge of its forward tow are not inexorable requirements of prudent tug navigation, * * * the question of competency of a lookout in any instance is primarily one of fact, to be realistically resolved under all the circumstances attending a collision.[3]
 
 
 11
 See also Bloomfield Steamship Co. v. Brownsville Shrimp Exchange;[4] China Union Lines, Ltd. v. A. O. Andersen & Co.[5] In Anthony v. International Paper Co.[6] the Fourth Circuit noted that in determining the necessity for an independent lookout, in addition to the other circumstances, it was proper to consider the size of the vessel and the opportunity of the navigator to have a full view. After a review of the record in the present case, we are not convinced that the district court was mistaken in any of its findings of fact.
 
 
 12
 The liberal jurisprudence of admiralty practice is unfettered by the ordinary rules of evidence.[7] With this in mind, we reject National's claim of evidentiary error. National's additional contention that the court erred in failing to indulge a presumption of adverse testimony as a result of appellees' failure to call or account for two witnesses to the collision is also rejected. On the facts of this case, the court was not obliged to draw the suggested inference.
 
 
 13
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954)
 
 
 [2]
 221 F.2d 377 (5th Cir. 1955)
 
 
 [3]
 Id. at 380
 
 
 [4]
 243 F.2d 869, 872 (5th Cir. 1957)
 
 
 [5]
 364 F.2d 769, 782 (5th Cir. 1966)
 
 
 [6]
 289 F.2d 574, 580 (4th Cir. 1961)
 
 
 [7]
 American Cyanamid Co. v. China Union Lines, Ltd., 306 F.2d 135, 142 (5th Cir. 1962)